CM & M GROUP, INC., Defendant
Below, Appellant, Cross-Appellee,

v.

Thomas J. CARROLL, Plaintiff Below,
Appellee, Cross-Appellant.

Supreme Court of Delaware.

Submitted: April 15, 1982.

Decided: Sept. 15, 1982.

H. James Conaway, Jr., Edward B. Maxwell, 2nd (argued), Young, Conaway, Stargatt & Taylor, Wilmington, and Clinton A. Stuntebeck, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel, for defendant below, appellant, cross-appellee.

William Prickett (argued), Vernon R. Proctor, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff below, appellee, cross-appellant.

Before HERRMANN, C.J., QUILLEN and HORSEY, JJ.

HERRMANN, Chief Justice:

In this appeal, the defendant, CM & M Group, Inc. (hereinafter "CM & M") seeks reversal of a Court of Chancery decision on the grounds that the Court committed reversible error (1) in ordering CM & M to produce for inspection and copying by the plaintiff, Thomas J. Carroll (hereinafter "Carroll"), fifteen separate categories of corporate books and records, and (2) in denying CM & M's motion for reassignment of the case to a Vice Chancellor. Carroll cross appeals, asking this Court to reverse the Trial Court's denial of his requests both for periodic updating of CM & M financial information, and an award of attorney's fees.

## I.

The plaintiff, Carroll, was one of the founders of Carroll, McEntee and McGinley, Inc. (hereinafter "Carroll, McEntee"), which began operations in December, 1969. Carroll, McEntee was a broker in U.S. Government securities. As a founder, Carroll received a 51% controlling interest in the firm and served as the company's first President and Chairman of the Board.

Personality conflicts developed subsequently between Carroll and many of his key employees. In 1972, these conflicts culminated in a threat by these employees of their mass exodus unless Carroll relinquished control of Carroll, McEntee. Carroll acceded to their demand and resigned as President and Chairman of the Board. Additionally, Carroll sold approximately one-third of his shares back to the corporation, retaining approximately one-third of the shares of Carroll, McEntee. He was compensated for the sale of the shares, receiving $900,000 for the sale of his stock, and a consulting contract worth approximately $750,000. Carroll retained his position on the board until 1976 when he was ousted from that position as a result of continuing personality conflicts. He retained his position as a consultant to the firm until 1980.

During the period 1970 to 1980, Carroll, McEntee grew rapidly, eventually comprising eight companies. Management determined that reorganization of the corporate structure was needed to separate the various companies. Consequently, in August, 1980, CM & M was formed as the holding company for all eight subsidiaries, including Carroll, McEntee.

CM & M is a closely held corporation. Pursuant to both an agreement between the shareholders of Carroll, McEntee, and the bylaws of CM & M, the corporation has a right of first refusal to purchase the shares of the corporation before any shareholder may accept a bona fide offer for the acquisition of shares by a third party.

Further, although Carroll is the largest single shareholder of CM & M, owning approximately one-third of its shares, this position carries little actual power. A voting trust created by twelve other shareholders controls 47.9% of the shares of CM & M and will exist until 1990.

Shortly after the 1980 reorganization, Carroll contacted Cyrus J. Lawrence, Inc., an investment firm, concerning the sale of his interest in CM & M. Robert P. O'Brien,

an employee of the investment firm, undertook to assist Carroll in the sale of his stock.

In December, 1980, Carroll made a written demand on CM & M for inspection and copying of quarterly financial statements of CM & M and Carroll, McEntee pursuant to 8 *Del.C.* § 220.[1] CM & M refused his first demand. Carroll subsequently revised his demand, seeking twenty-seven categories of information from CM & M's books and rec-

ords. CM & M denied the second request and this litigation ensued.

At trial, Carroll prevailed. While the Court of Chancery found that Carroll already possessed some of the information requested, the Court ordered CM & M's production of fifteen other categories of books and records for Carroll's inspection and copying.[2] We affirm, with modifications.

---

1. 8 *Del.C.* § 220 provides:
   "§ 220. Stockholder's right of inspection.
   "(a) As used in this section, 'stockholder' means a stockholder of record.
   "(b) Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the corporation at its registered office in this State or at its principal place of business.
   "(c) If the corporation, or an officer or agent thereof, refuses to permit an inspection sought by a stockholder or attorney or other agent acting for the stockholder pursuant to subsection (b) or does not reply to the demand within 5 business days after the demand has been made, the stockholder may apply to the Court of Chancery for an order to compel such inspection. The Court of Chancery is hereby vested with exclusive jurisdiction to determine whether or not the person seeking inspection is entitled to the inspection sought. The Court *may summarily order the corporation to permit* the stockholder to inspect the corporation's stock ledger, an existing list of stockholders, and its other books and records, and to make copies or extracts therefrom; or the Court may order the corporation to furnish to the stockholder a list of its stockholders as of a specific date on condition that the stockholder first pay to the corporation the reasonable cost of obtaining and furnishing such list and on such other conditions as the Court deems appropriate. Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, he shall first establish (1) that he has complied with the provisions of this section respecting the form and manner of making demand for inspection

of such documents; and (2) that the inspection he seeks is for a proper purpose. Where the stockholder seeks to inspect the corporation's stock ledger or list of stockholders and he has complied with the provisions of this section respecting the form and manner of making demand for inspection of such documents, the burden of proof shall be upon the corporation to establish that the inspection he seeks is for an improper purpose. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper. The Court may order books, documents and records, pertinent extracts therefrom, or duly authenticated copies thereof, to be brought within this State and kept in this State upon such terms and conditions as the order may prescribe."

2. The Trial Court ordered opened to the plaintiff's inspection the following:
   "(1) The complete audited and unaudited financial statements of CM & M for the years 1977–81, which are not already in plaintiff's possession.
   "(2) A disclosure of the current total remuneration of all officers and directors of CM & M and the percentage thereof of the gross income of CM & M.
   "(3) A description of outstanding current stock options of CM & M.
   "(4) A description of any transactions with CM & M involving any of its current officers and directors.
   "(5) Current agreements relating to any material acquisition or disposition of corporate assets and letters of intent relating to any such transaction.
   "(6) Current major investment advisory agreements of CM & M.
   "(7) Current major software and hardware contracts of CM & M.
   "(8) Any other current major contracts, including employment contracts between CM & M and its directors or officers.
   "(9) Current stock option or other plans designed to benefit management.
   "(10) Current shareholders' agreements and any other voting agreements other than the

## II.

The defendant advances three arguments challenging the Court of Chancery's granting of Carroll's request for production of CM & M's books and records:

### A.

CM & M argues that Carroll's request is not for a "proper purpose" under 8 *Del.C.* § 220, i.e., a purpose "reasonably related to [Carroll's] interest as a stockholder." Carroll contends that he properly seeks the information to value his shares and facilitate the sale of his stock. CM & M concedes that this purpose, if it were Carroll's actual purpose, would be valid. The corporation contends, however, that Carroll's actual purpose is to procure all the financial information pertaining to CM & M that some potential third-party buyer might want. CM & M thus concludes that the information is not really for Carroll, but for outsider third parties who are not shareholders of CM & M. CM & M asserts, therefore, that Carroll's request constitutes a thinly-veiled attempt to force CM & M to buy his stock at an unfairly inflated price so that CM & M can prevent the general disclosure of its financial information. We find this position untenable.

■ The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection. 8 *Del.C.* § 220(b); *General Time Corporation v. Talley Industries,* Del.Supr., 240 A.2d 755 (1968); *Skoglund v. Ormand Industries,* Del.Ch., 372 A.2d 204, 207 (1976). The Statute defines a proper purpose as one which is "reasonably related to such person's interest as a stockholder," 8 *Del.C.* § 220(b). The Court of

Chancery is to determine the propriety of the purpose from the facts in each case. *State ex rel. Brumley v. Jessup & Moore Paper Co.,* Del.Supr., 77 A. 16, 23 (1910); *State ex rel. Cochran v. Penn-Beaver Oil Co.,* Del.Supr., 143 A. 257, 260 (1926). Further, once a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant. *General Time Corporation v. Talley Industries,* Del.Supr., 240 A.2d at 756; *Skouras v. Admiralty Enterprises,* Del.Ch., 386 A.2d 674, 678 (1978).

■ While the Court may discount a secondary or ulterior purpose, the primary purpose must not be adverse to the best interests of the corporation. *Skouras v. Admiralty Enterprises, Inc.,* Del.Ch., 386 A.2d at 678; *Skoglund v. Ormand Industries,* 372 A.2d at 207. Moreover, the Court may deny inspection where the shareholder is shown to have possession of all the information that is requested, or where the request is made out of sheer curiosity, unrelated to any legitimate interest of the stockholder, or where the sole purpose of the inspection is to harass the corporation. See *State ex rel. Miller v. Loft,* Del.Super., 156 A. 170, 172 (1931).

■ The Statute places the burden of proving proper purpose on the shareholder when he seeks inspection of records other than the corporation's stock ledger or list of shareholders. 8 *Del.C.* § 220(c). We find that Carroll has met his burden.

■ Both parties concede that the valuation of one's shares is a proper purpose for the inspection of corporate books and records. See *State ex rel. Rogers v. Sherman Oil Co.,* Del.Super., 117 A. 122, 125 (1922); *State ex rel. Brumley v. Jessup & Moore Paper Co.,* Del.Ch., 77 A.2d at 20. The

voting trust agreement which plaintiff already has.

"(11) Current instruments creating any long or short term indebtedness, including extension agreements.

"(12) An account of any increases or decreases in the amount of outstanding common stock of CM & M.

"(13) A description of any current legal proceedings other than ordinary litigation incident to its business to which CM & M has become a party or in which any of its property has become involved.

"(14) A description of any indebtedness of each CM & M director or officer, or of any associate of any such officer or director, to CM & M.

"(15) A description of the current trading and investment inventory of CM & M."

Court of Chancery concluded that Carroll is seeking valuation of his shares in order to negotiate a fair sale of his stock and does, therefore, have a proper purpose for the inspection of certain CM & M books and records. The Court stated:

"Having considered the evidence adduced at trial, I am satisfied that Mr. Carroll has a proper purpose in asking for information concerning the value of his shares, being persuaded that he genuinely wishes to sell his stock, having hired the services of Mr. O'Brien to assist him in doing so within the available, admittedly limited market existing for it (the corporation itself being the most likely purchaser) only a very special type of buyer being interested in acquiring such stock. Thus, the interest is a minority one, a voting trust will exist until 1990, no dividends have been declared since 1976, and the company has the right of first refusal of the purchase of the shares of the defendant. Nonetheless, there being no doubt in my mind that plaintiff genuinely desires to sell his stock, I find that he has met the requirements of the statute."

These findings and conclusions of the Trial Court are adequately supported by the record, and appear to be the result of an orderly and logical deductive process. See *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972). They emphasize the need for inspection in the instant situation involving a close corporation, the shares of which are not publicly traded, and which are subject to restrictions making their sale difficult, if not impossible.

Accordingly, we find no error as to this ground of the appeal.

### B.

■ CM & M contends that the Court of Chancery applied improperly the "primary/secondary purpose" test in concluding that Carroll's attempt to force CM & M to purchase his shares was, at most, a purpose secondary to his primary purpose of valuing his shares to facilitate their sale. We disagree. Having found a proper purpose, the Court properly passed over any ancillary

purpose of Carroll's to coerce CM & M to purchase his shares. See *General Time Corporation v. Talley Industries,* Del.Supr., 240 A.2d at 756; *Skouras v. Admiralty Enterprises,* Del.Ch., 386 A.2d at 678 (1978).

### C.

■ Finally on this facet of the appeal, CM & M argues that the ruling of the Court of Chancery is overbroad. The corporation contends that the Court granted inspection of documents beyond those "essential" for the valuation of Carroll's stock.

We find CM & M's position again untenable. The determination of the value of the plaintiff's shares and the data essential thereto are, in large part, factual determinations to be overturned only if clearly wrong. See *Levitt v. Bouvier, supra.* The findings of the Court of Chancery in this respect are adequately supported by the record and are not clearly wrong. Accordingly, they will not be disturbed.

\* · \* \* \* \*

We thus affirm the judgment of the Court of Chancery with respect to Carroll's general right to inspect the specified books and records of CM & M.

### III.

While we affirm the judgment of the Court of Chancery with respect to Carroll's general right to inspection, we are cognizant of the corporation's concern that Carroll's activities may open up CM & M's confidential corporate financial data to third parties who may not be genuinely interested in the purchase of his shares and who are not entitled to the information— outsiders who may be merely curiosity-seekers.

■ Counterposed to the duty to protect the rights of the stockholder, the Court has the duty to safeguard the rights and legitimate interests of the corporation. *State ex rel. Cochran v. Penn-Beaver Oil Co.,* Del. Supr., 143 A. at 260. It follows that the Court of Chancery is empowered to protect the corporation's legitimate interests and to prevent possible abuse of the shareholder's

right of inspection by placing such reasonable restrictions and limitations as it deems proper on the exercise of the right. 8 *Del.C.* § 220(c); *Henshaw v. American Cement Corp.,* Del.Ch., 252 A.2d 125, 129 (1969).

■ To this end, we remand with direction that the Court of Chancery modify its judgment as follows: (1) Any inspection by Carroll under the Trial Court's Order shall be contingent upon the requirement that neither the plaintiff nor any agent of his shall disclose information obtained as a result of these proceedings to anyone who has not first made a written representation to the plaintiff that he is a bona fide prospective purchaser of Carroll's stock and executed an agreement of confidentiality, both to be in form approved by the Court of Chancery; (2) The name and address of any such prospective purchaser, together with such representation and agreement, shall be served and filed by the plaintiff in this cause at least 5 days before any such disclosure; (3) Violation of these conditions shall expose the plaintiff and the prospective purchaser to possible sanctions by the Court of Chancery; and (4) Jurisdiction of the Court of Chancery shall be retained, for a period of two years after the issuance of remand herein, to hear and determine any application for such sanction.

### IV.

Carroll cross appeals, requesting the updating of financial information subject to inspection. We treat this cross appeal solely within the context of the facts of this case.

The Court of Chancery denied Carroll's request for periodic updating, finding that the information ordered to be produced, in conjunction with the information already in Carroll's possession, would serve sufficiently to value his shares and facilitate their sale.

Section 220(c) clearly empowers the Court of Chancery, in the exercise of its discretion, to order the inspection of corporate books and records to ensure that the information required by the shareholder remains current.[3] It is a contradiction to conclude, on the one hand, that certain books and records must be produced for inspection and copying because they are "essential" to the valuation and the particular difficulties of the sale of Carroll's shares but, on the other hand, to limit such inspection to a single time. Assuming that Carroll may not be able to sell his stock immediately upon production of the information ordered by the Court, or soon thereafter, subsequent updated information must be deemed equally "essential" in valuing his shares—without the necessity of instituting new actions periodically for that purpose.

■ Accordingly, the denial of a periodic updated inspection is reversed as an abuse of discretion, and the cause remanded with the direction that the Court of Chancery retain jurisdiction over this action, for a period of one year after the issuance of the remand herein, to hear and determine not more than two petitions by Carroll to inspect and copy necessary corporate books and records periodically for updated information to facilitate the valuation and sale of his stock.

### V.

■ CM & M argues that the Court of Chancery abused its sound judicial discretion by failing to reassign the case to a different trial judge after a social encounter between the Trial Judge and one of plaintiff's attorneys. CM & M contends that the encounter gave rise to a fatal "appearance of partiality."

CM & M does not dispute the Trial Judge's account of the incident in question. The Trial Judge stated that the plaintiff's attorney and he discovered, by chance, that they were vacationing on the same Caribbean island; that they and their wives social-

---

**3.** 8 *Del.C.* § 220(c) provides, in pertinent part:

"The Court may, in its discretion, prescribe *any limitations or conditions with reference to*

the inspection, *or award such other or further relief as the Court may deem just and proper.*" (emphasis added)

ized once briefly on that occasion. CM & M does not allege that any actual impropriety or wrongdoing occurred as a result of this encounter.

CM & M's argument that the Trial Judge abused his discretion by refusing to disqualify himself is completely unmeritorious. It is axiomatic that a Judge must be careful in his social contacts to avoid the appearance of impropriety. See Comment to Canon 2 of the Code of Judicial Conduct. Some social contact, however, between judges and members of the Bar who are then litigating matters before them is almost inevitable, especially in a small jurisdiction like Delaware. We will not mandate isolation of members of the Judiciary from social contact with members of the Bar. Such mandate could lead to needless disqualification from pending cases, to the detriment of litigants and judicial economy.

We look upon this ground of appeal as frivolous.

## VI.

Finally, we address Carroll's arguments concerning the denial of his request for counsel fees.

As a general rule, equity will grant ordinary court costs to the prevailing party in every case "as is agreeable to equity." 10 *Del.C.* § 5106; *Walsh v. Hotel Corp. of America,* Del.Supr., 231 A.2d 458, 462 (1967); *Bodley v. Jones,* Del.Supr., 65 A.2d 484, 487 (1948). "Ordinary court costs," however, do not generally include a party's counsel fees. *Walsh,* 231 A.2d at 462.

Instead, counsel fees are ordinarily borne by the respective parties. *Mencher v. Sachs,* Del.Supr., 164 A.2d 320, 322 (1960); *Maurer v. International Re-insurance Corp.,* Del.Supr., 95 A.2d 827, 830 (1953). In equity, however, the grant or denial of counsel fees lies within the sound discretion of the Chancellor. *Chrysler Corp. v. Dann,* Del. Supr., 223 A.2d 384, 386 (1966); *Bodley v. Jones,* Del.Supr., 65 A.2d at 487. Consequently, the ruling of the Court will be overturned only if it is arbitrary and capricious. See *Chavin v. Cope,* Del.Supr., 243 A.2d 694, 695 (1968).

The general rule against awarding attorney's fees to the prevailing party is subject to several narrow exceptions, but Delaware courts have been very cautious in granting exceptions to the rule. *Walsh v. Hotel Corp. of America,* Del.Supr., 231 A.2d at 462. One such exception is the "common fund" exception. This exception provides that when the efforts of one member litigant of a class result in the creation of property as a "common fund" which inures to the benefit of all members of the class, the successful litigant is entitled to an allowance of counsel fees to be paid from the fund or property which his efforts have created, the amount to be fixed in the sound discretion of the Chancellor. *Chrysler Corp. v. Dann,* Del.Supr., 223 A.2d at 386; *Maurer v. International Re-insurance Corp.,* Del.Supr., 95 A.2d at 830. Successful minority stockholders' suits and creditors' bills resulting in the recovery of money or property or the establishment of a lien are cases in which the exception may typically be applied. *Id.*

Carroll makes an imaginative argument in an attempt to bring the facts of this case within the "common fund" exception. He argues that according to *Maurer* the "common fund" exception relates to "the creation, protection or distribution of a common fund or common property subject to administration by the Court of Chancery." 95 A.2d at 830. Carroll notes that 8 *Del.C.* § 220 vests exclusive jurisdiction in the Court of Chancery to determine whether a stockholder is entitled to inspect certain books and records of the corporation. Carroll reasons that the statute vests broad remedial powers in the Court of Chancery with respect to these corporate records and documents. It follows, Carroll asserts, that the books and records of a Delaware corporation constitute "common property" which is "subject to the administration of the Court of Chancery" and thus subject to the exception.

While these are novel and intersting arguments, they lack persuasive weight. In the instant case, unlike the situations discussed in *Maurer* and *Dann, supra,* Carroll's efforts have not created property as a common fund out of which the attorney's fees can be paid. The "common fund" exception is thus inapplicable.

Carroll also argues that the equities in the instant case mandate an award of attorney's fees and that the Trial Court, therefore, abused its discretion in denying Carroll's request. We are not persuaded that the equities support such an award.

Accordingly, we find no abuse of discretion in the Court's denial of Carroll's request for counsel fees.

\* \* \* \* \*

Affirmed, with the aforementioned modifications.