HELNSMAN MANAGEMENT SERV-
ICES, INC., a Massachusetts
corporation, Plaintiff,

v.

A & S CONSULTANTS, INC., a
Delaware corporation,
Defendant.

Civ. A. No. 8596.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 20, 1987.
Decided: March 13, 1987.

Lawrence S. Drexler, of Elzufon & Bailey, P.A., Wilmington, for plaintiff.

Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, for defendant.

OPINION

JACOBS, Vice Chancellor.

On March 18, 1986, Helmsman Management Services, Inc., a Massachusetts corporation and subsidiary of Liberty Mutual Insurance Company ("Helmsman"), submitted a demand upon the defendant A & S Consultants, a Delaware corporation, ("A & S"), pursuant to 8 *Del. C.* § 220, to inspect certain of A & S's books and records. Thereafter, the parties engaged in negotiations which were not resolved to Helmsman's satisfaction and which resulted in Helmsman filing this action. The parties

again attempted to negotiate an amicable resolution, again without success. The matter was tried on February 11, 1987. This is the decision of the Court, following trial and the submission of post-trial memoranda, on the merits of plaintiff's demand to inspect A & S's books and records.

## I.

On July 20, 1983, Helmsman and A & S entered into an agreement (the "1983 Agreement") under which Helmsman: (i) acquired certain ownership and exclusive license rights in a computer software system, then owned by A & S, called RISKTRAC™, (ii) agreed to market RISKTRAC™ to certain of Liberty Mutual's customers, with A & S agreeing to provide consulting services to those customers, (iii) obtained an option to acquire the sole ownership rights to RISKTRAC™ exercisable in July, 1986, and (iv) became a 25% stockholder of A & S, which, as of that point, had been solely owned by two persons, Carol Nashawaty and Nancy Schwartz.

Thus, as a result of the 1983 Agreement, Helmsman came to occupy a dual relationship to A & S: as a 25% stockholder of A & S (for which stock Helmsman paid $50,000), and as a customer and contractual partner of A & S. Between July, 1983 and July, 1986, Helmsman paid A & S approximately $1.1 million, of which $800,000 was for certain contract fees and $300,000 was for certain rights to use RISKTRAC™. During that three year period, A & S has paid no dividends.

Since November, 1983, Helmsman periodically reviewed certain of A & S's books and records, apparently to verify A & S's billings to Helmsman. Other than that limited review, Helmsman played no role in the internal affairs of A & S, which at all times was managed by its officers and principal (75%) shareholders, Ms. Nashawaty and Ms. Schwartz.

In January and February, 1986, Helmsman conducted a review of A & S's records over a six day period, apparently to verify A & S's prior billings to Helmsman. During that review, numerous documents were produced and examined and as a result, information was uncovered that eventually led to the present rift between Helmsman and A & S.

The January, 1986 review revealed what Helmsman's auditors believed to have been excessive billings by A & S amounting to approximately $175,000, plus an additional $127,000 that Helmsman had been forced to expend to replace an "unusable" program code previously purchased from A & S. The review also confirmed that Helmsman had received no return on its stock investment nor any notice or minutes of any A & S stockholder meetings. Accordingly, it was recommended that Helmsman "initiate action to recover the $175,-386...." To date no action to recover the alleged overcharges has been instituted.

The foregoing events also prompted Helmsman to request copies of the minutes of all A & S stockholder meetings that had taken place since 1983. Under cover of a letter dated March 13, 1986, Carol Nashawaty forwarded to Liberty Mutual the minutes of A & S's shareholder meetings for 1984 and 1985. Ms. Nashawaty's letter revealed that Helmsman, although a 25% shareholder of A & S, had never been furnished notice of those meetings. Her letter also enclosed a notice for the 1986 annual meeting, which was to occur on March 17, 1986, only three days later, as well as waivers of notice for the 1984 and 1985 annual stockholders' meetings which Ms. Nashawaty requested Helmsman to sign.

On March 18, 1986, James F. Kelleher, Esquire, an associate counsel for Liberty Mutual, responded in writing to Ms. Nashawaty's letter on behalf of Helmsman. In his response Mr. Kelleher declined to execute the waiver of notice. He also advised Ms. Nashawaty that the timing of the 1986 annual meeting had effectively denied Helmsman its right to participate in the meeting and to vote in the election of directors, and that the failure to give notice to Helmsman of the 1984 and the 1985 shareholders meetings had denied Helmsman an opportunity to exercise its rights as a shareholder.

With Mr. Kelleher's letter there was included a demand for an inspection of A &

S's books and records pursuant to 8 *Del. C.* § 220. The Helmsman demand recited four purposes for the inspection; namely,

(1) To determine the value of stock owned by Helmsman;

(2) To ascertain the corporation's condition or its affairs so that Helmsman can vote and otherwise exercise its rights in an informed manner;

(3) To determine the reason for the non-payment of dividends;

(4) To ascertain whether or not there is [sic] sufficient funds available for the payment of dividends.

On or about April 15, 1986, Helmsman approached the accounting firm of Laventhol & Horvath ("Laventhol") for assistance in inspecting A & S's books and records. On that date John E. McMahon of Helmsman wrote a letter to Mr. William Carmen of Laventhol (DX 5), stating:

> Helmsman has become increasingly concerned over the general conduct of A & S's business including the management practices of its two principals. A failure to have declared any dividends, irregularities or perhaps a certain laxity in the observance of corporate formalities together with the fact that A & S's books and records have not been subjected to an audit in accord with generally accepted auditing practices has created some question as to the value of Helmsman's minority interest. As a client, Helmsman has had first hand experience of A & S business methods and services, and experience which has not been entirely positive (In this regard see Exhibit 2). All of this coupled with certain other factors has combined to create a question of the feasibility of any continuing relationship either as a stockholder or client. We have begun to persue [sic] avenues of legal redress against A & S. . . .

Mr. McMahon advised Mr. Carmen that Helmsman was considering engaging La-

venthol to conduct a "rigorous audit" of A & S for fiscal years ending September 1983, 1984 and 1985, with an interim audit for 1986. Two exhibits were to be prepared, the first to show "all amounts expended on behalf of the managing stockholders and officers of the company", and the second to "analyze pending and sold accounts by product line."

Thereafter, Helmsman engaged Laventhol to inspect A & S's records and authorized Laventhol to deal directly with A & S on its behalf in arranging the inspection. On May 6, 1986, Helmsman advised A & S that Laventhol would be acting on its behalf, but A & S declined to make its books and records available for inspection. In response, Helmsman filed this action under 8 *Del. C.* § 220. The parties then agreed to hold this action in abeyance while they attempted once again to resolve their differences.

On May 23, 1986, Laventhol wrote a letter to Helmsman, advising it of the categories of records that should be included in any inspection made by Laventhol. The list of documents included practically every significant financial record of A & S for fiscal years 1983 through 1986.[1] Helmsman forwarded Laventhol's letter containing that information to Ms. Nashawaty at A & S, who, in the meanwhile, had changed her mind and reconsidered the earlier refusal to permit inspection of A & S's books and records. On May 30, 1986, Ms. Nashawaty confirmed to Helmsman that the inspection could go forward.

On June 18, 1986, Laventhol conducted a one day inspection of the A & S records. According to Mr. Carmen, the Laventhol partner in charge of the matter, the purpose of the inspection was not to perform the audit itself but, rather, was to determine whether the records inspected were sufficient to enable an audit to be conduct-

---

**1.** That is, all books of original entry, (*e.g.,* journals for cash receipts, cash disbursements, purchases, sales; the general ledger), purchase invoices, sales invoices, accounts receivable and accounts payable ledgers, bank statements and cancelled checks, payroll records and payroll tax returns, financial statements, federal and state income tax returns, corporate minutes, contracts, leases, profit sharing plan, and other related and relevant records and documents, plus work papers of A & S's accountants prepared in connection with A & S's financial statements for the period in question. (PX Exh. F)

ed. A & S's accountants had apparently come away with a different understanding: when advised that Laventhol now desired to perform a "full audit" of the records previously reviewed, A & S's accountants responded that Laventhol had already been afforded its opportunity to do so on June 18, 1986.[2]

Subsequent efforts to resolve the impasse were unsuccessful, and the matter went to trial.

## II. Helmsman's Entitlement To An Inspection

A & S raises several defenses in opposition to Helmsman's claim for relief. A & S contends that: (i) it never "refused" Helmsman's demand for inspection, since Helmsman had been permitted to inspect all the documents it had previously requested; (ii) Helmsman does not have a proper purpose, because it seeks to gather evidence to support a potential claim to recover monies under the 1983 Agreement, which is not a purpose related to Helmsman's interest as a stockholder. Finally, A & S argues that (iii) even if Helmsman's demand and its purpose is proper, the scope of the inspection it seeks is overbroad and excessive in relation to its claimed purposes.[3]

Those defenses are now addressed.

### A. Refusal of Demand For Inspection

■ A & S's first argument—that there was no "refusal" of the inspection requested—is without basis. A failure to respond to a demand within the five day statutory period is tantamount to a refusal. See Henshaw v. American Cement Corp.,

Del. Ch., 252 A.2d 125 (1969). Here A & S did not respond to Kelleher's demand until two weeks after it had been made. In addition, even though Laventhol was allowed to inspect the books and records for what it believed to be the limited purpose of determining what records would be needed to perform an audit, A & S refused to permit a later inspection for purposes of conducting the audit itself. That also constituted a "refusal" within the contemplation of 8 Del.C. § 220.

### B. Propriety of Purpose

A & S next contends that Helmsman lacks a proper purpose, i.e., one related to its interests as a shareholder, in seeking the inspection. That contention raises two distinct issues: (1) whether Helmsman has a purpose or purposes that relate to its interest as a stockholder and (2) if so, whether they constitute Helmsman's primary purpose in seeking the inspection.

■ The test of a proper purpose is whether it is reasonably related to the plaintiff's interest as a shareholder. 8 Del. C. § 220(b). The propriety of a demanding shareholder's purpose must be determined from the facts in each case, and the burden of proving a proper purpose is upon the shareholder. Once it is determined that a shareholder has a proper purpose that is primary, any secondary purpose or ulterior motive that the stockholder might have is irrelevant. 8 Del. C. § 220(c); CM & M Group, Inc. v. Carroll, Del.Supr., 453 A.2d 788, 792 (1982); Skouras v. Admiralty Enterprises, Inc., Del. Ch., 386 A.2d 674, 678

---

**2.** By that point A & S had become concerned that Helmsman's purpose was to develop information for a possible lawsuit against A & S to recover the alleged overcharges. Moreover, in June, 1986, Helmsman exercised its option under the 1983 Agreement to acquire RISKTRAC™. As a result, Helmsman became the sole owner of RISKTRAC™ and a competitor of A & S, at least insofar as Helmsman replaced A & S as the consultant to then-existing customers using RISKTRAC™.

**3.** At the conclusion of the plaintiff's case, A & S moved to dismiss on the ground that the demand was legally insufficient, in that it contained no evidence that Helmsman had personally authorized Laventhol to make the inspec-

tion. The motion was denied on the basis that Mr. Kelleher (who made the demand on behalf of Helmsman) had been properly authorized, and that, therefore, the demand was valid on its face. Defendant's argument went not to the validity of the demand but rather to the question of whether Laventhol would be entitled to assist Mr. Kelleher in any inspection ordered by the Court. At that stage A & S would be entitled to formal evidence of Laventhol's authority to act on Helmsman's behalf. Accordingly, as a condition to Laventhol's participation in any books and records inspection, Helmsman will be required to furnish appropriate evidence of Laventhol's authority.

(1978); *Skoglund v. Ormand Industries, Inc.*, Del. Ch., 372 A.2d 204, 207 (1976).

In its demand Helmsman recites four purposes for seeking to inspect A & S's books and records. These are: (1) to determine the value of its stock interest in A & S, (2) to ascertain the corporation's condition or its affairs so that Helmsman can vote and otherwise exercise its rights in an informed manner, (3) to determine the reason for the nonpayment of dividends, and (4) to determine whether or not there are sufficient funds available for the payment of dividends.

 As a purely legal matter, Helmsman's first, third and fourth purposes are clearly related to its interest as a stockholder. Helmsman desires to value its minority interest in A & S, a closely held corporation whose shares are not publicly traded and are subject to restrictions (*i.e.*, A & S's right of first refusal) that make their sale difficult. That is a valid purpose for inspecting a corporation's books and records. *CM & M Group, Inc. v. Carroll*, 453 A.2d at 792. Likewise valid are Helmsman's stated purposes of determining A & S's present and past ability to pay dividends. The ability to pay dividends is one of several recognized components of a corporation's fair value. *See Application of Delaware Racing Association*, Del. Ch., 206 A.2d 664 (1965), *aff'd*, Del.Supr., 213 A.2d 203 (1965). Therefore, A & S's ability to pay dividends would be a proper purpose for an inspection under § 220, if only as part of a more general inquiry into the value of Helmsman's A & S holdings.

 Of some concern is the fact that Helmsman's valuation purpose is, at the present time, somewhat academic. It is not sufficient for Helmsman merely to assert that it would like to value its A & S stock. Without a showing of a present need for such a valuation, a mere statement of that purpose, though valid in law, might not be *bona fide* in fact. At this point Helmsman has made no decision to dispose of its A & S stock, has taken no steps to market that stock, and has no potential buyer for it. *Compare CM & M Group, Inc. v. Carroll, supra.* On the other hand, this Court has recognized that there may be situations where a shareholder in a closely-held corporation needs to value his stock to enable him to decide whether or not to sell, and, if so, on what terms. *See Radwick Pty., Ltd. v. Medical Incorporated*, Del. Ch., Civil Action No. 7610, Berger, V.C. (November 7, 1984). It is clearly inferable from the evidence that this is such a case. There is a very limited market for Helmsman's A & S stock; indeed, given the corporation's right of first refusal, the only potential buyer may be A & S. For that reason, Helmsman must necessarily resort to A & S's books and records to establish a value as a predicate for deciding whether its stockholdings are marketable and, if so, on what terms. Those considerations, plus Helmsman's interest in extricating itself from a minority stockholder position in a corporation with which it is no longer in a friendly relationship, persuade me that Helmsman's valuation purpose is valid in fact as well as in law.

Helmsman's remaining stated purpose—"to ascertain the corporation's condition or its affairs so that Helmsman can vote and otherwise exercise its rights in an informed manner"—is so vague and so broad in its phraseology that a literal reading could justify an inspection of any or all of A & S's records. Fortunately, however, that stated purpose need not be read literally, because Helmsman's own interpretation of that purpose is narrower than the chosen manner of its expression.

 Helmsman's broadly-phrased purpose may be viewed as subsuming two independent, far narrower purposes. The first is to investigate the possibility of general mismanagement and waste. Conceptually speaking, that purpose is valid. *Skoglund v. Ormand Industries, Inc.*, 372 A.2d at 210–211. Factually, however, that purpose finds no support in the record, because, in this case, unlike *Skoglund v. Ormand Industries, Inc., supra*, there is no record evidence of possible corporate mismanagement or waste such as would support the type of broad, general records inspection ordered in *Skoglund*. A mere

statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief. There must be some evidence of possible mismanagement as would warrant further investigation of the matter. *See Neely v. Oklahoma Publishing Company*, Del. Ch., Civil Action No. 5293, Brown, V.C. (August 15, 1977), *reprinted at* Del. J. Corp. L. 138, 143 (1977). No such evidence was adduced in this case.

■■■■■ Helmsman's second, more specific, purpose under this heading is to inform itself of those corporate transactions of which it was entitled to notice and an opportunity to vote at the A & S shareholder meetings. That a shareholder is entitled to notice of the date, time, and place of an annual shareholder's meeting is a proposition so fundamental as to require no citation of authority. It would follow that a shareholder who is not furnished with such notice should be permitted to inform himself of those corporate transactions about which he could have otherwise learned and voted upon. For that purpose, the stockholder should be entitled to inspect the appropriate books and records of the corporation. It is undisputed that Ms. Nashawaty and Ms. Schwartz caused A & S to give Helmsman untimely notice of the 1986 meeting, and no notice of the 1984 and 1985 stockholder meetings. At a minimum, that constituted a breach of their fiduciary duty as A & S's officers and deprived Helmsman of its right to become informed of, and to vote upon, the transactions approved or ratified at those meetings.

In response to the foregoing, A & S argues that none of Helmsman's stated purposes can be accepted at face value, because, in reality, they are only a smokescreen. A & S claims that Helmsman's true and only purpose is to develop evidence to support a potential a contract claim against A & S, which is not a purpose related to its interest as a stockholder. This is so, A & S contends, because Helmsman's stock investment in A & S was only $50,000, yet it is willing to pay Laventhol $25,000 to conduct an audit. A & S urges that as an economic matter such an expenditure makes no sense, and would make sense only if Helmsman's purpose were to recapture some of the $1 million it paid to A & S pursuant to the 1983 Agreement. Moreover, says A & S, not until now did Helmsman ever manifest the slightest concern about A & S's financial condition or its internal corporate affairs.

■■ There is merit in some (but not all) of what A & S argues. Unquestionably Helmsman occupies a dual relationship to A & S, both as a contract partner/client and as a stockholder. Helmsman was keenly aware of its dual roles, and in demanding to inspect A & S books and records, has sought to further both interests. Helmsman's April 15, 1986 letter to Laventhol, which shows that Helmsman intended for Laventhol to develop information helpful to its interests both as an A & S contract creditor and as a minority stockholder, is telling evidence of that point. Moreover, Helmsman does not adequately explain why it would pay $25,000 for an audit, if its only economic stake were a minority stock interest originally acquired for $50,000 in a small company that is now losing money. The evidence clearly shows, and I find, that Helmsman retained Laventhol to conduct the books and records inspection in order to further its interests both as a potential contract creditor *and* as a stockholder.

That finding, however, does not conclude the analysis. For even if Helmsman does have an ulterior (*i.e.*, a non-shareholder-related) purpose, it would still not be barred from relief under § 220, unless the ulterior purpose is also its primary purpose. *CM & M Group, Inc. v. Carroll*, 453 A.2d at 792. Having weighed the evidence, I am satisfied that it is the stockholder-related purpose, and not the contract-creditor interest, that forms Helmsman's predominant reason for seeking the inspection at issue here.

■■■ The issue of whether a concept so elusive as purpose or motive is "primary" or "secondary", involves a judgment that necessarily is qualitative, not mathematical. Specifically, where a stockholder who seeks

inspection of corporate books and records has two purposes, one stockholder-related and the other not, the critical inquiry is whether the stockholder-related purpose predominates over the ulterior purpose. Here it does. A lengthy (6 day) inspection—relating solely to the Helmsman/A & S contract relationship—took place in January, 1986, but no significant inspection addressed to Helmsman's "stockholder related" concerns has yet occurred. This suggests that while the requested inspection would concern itself to some extent with uncovering information relevant to a possible contract claim, its primary thrust would be to develop information to further Helmsman's interests as a stockholder. Consequently, the existence of Helmsman's secondary, ulterior motive will not operate to bar Helmsman from relief under § 220. Plaintiff's ulterior purpose will, however, be taken into account in determining the scope of the relief to which Helmsman would be entitled. *CM & M Group, Inc. v. Carroll*, 453 A.2d at 793–94 ("the Court of Chancery is empowered to protect the corporation's legitimate interests and to prevent possible abuse of the shareholder's right of inspection by placing such reasonable restrictions and limitations as it deems proper on the exercise of the right.")

### III. *Scope of Relief*

■ Having identified the plaintiff's purposes, and having found that those purposes are proper and that they predominate over any ulterior purpose, the Court must next determine the scope of the relief to be granted. In determining the scope of inspection relief, the overriding principle is that only those records that are "essential and sufficient" to the shareholder's purpose will be included in the court-ordered inspection. *Neely v. Oklahoma Publishing Company*, Del. Ch., Civil Action No. 5293, Brown, V.C. (August 15, 1977), *reprinted at* 3 Del.J.Corp.L., 139, 142 (1977); *State ex rel. Rogers v. Sherman Oil Co.*, Del.Super., 117 A.122 (1922). In this case that assessment is far from easy, because

both parties have taken extreme positions. Helmsman contends that it is entitled to inspect *all* records—corporate, financial and otherwise—from 1984 onwards that Laventhol deems necessary (i) to develop audited financial statements for fiscal years 1984 and 1985, (ii) to verify the audited statement for fiscal year 1986 [4], and (iii) to perform an "earnings valuation" of A & S. For that purpose Helmsman lists fifteen separate categories of records that, in the aggregate, would appear to include all A & S records of any significance since 1984.

■ A & S, for its part, argues that Helmsman has already been furnished access to much of what it now seeks, in particular, copies of A & S financial statements for fiscal years 1984–1986. That being the case, A & S contends that a proper balancing of the parties' respective rights would be to restrict the inspection to A & S's tax returns and to its present contracts with customers, with the names of the customers deleted.

In my view, neither side's position is completely justified, and the proper result lies (as is often the case) somewhere in between.

Helmsman predicates its entire argument on the assumption that to achieve its purposes of valuing its investment and informing itself of A & S's affairs, an audit for the last three fiscal years is required. Accordingly, Helmsman's "scope-of-inspection" evidence was focused upon the categories of documents needed to perform an audit, rather than upon those documents that are needed to value Helmsman's stockholdings in A & S or to inform Helmsman of A & S's affairs. The difficulty with this approach is that Helmsman has not established that a full audit of A & S's financial condition for the past three years is essential to achieve either purpose. Indeed, much of the information needed to value the A & S stock would involve A & S's *current* values, and A & S's most current

---

**4.** A & S financial statements for fiscal years 1984 and 1985 are not audited; the fiscal 1986 financial statement is audited.

(1986) financial statement is audited. To the extent that 1984 and 1985 information is also required to establish a valuation, no showing was made that A & S's present financial statements for those years cannot be relied upon.

The virtue of an audit is that it constitutes the most reliable form of financial presentation, because of the procedures used for verification and reconciliation. But from that it does not necessarily follow, *a fortiori*, that because a financial statement is unaudited, it is unreliable. And, no evidence was presented that the 1984 and 1985 financial statements are so inaccurate, incomplete or otherwise unreliable as not to fairly present A & S's financial position and as to require their total reconstruction in audited form. Finally, any doubts on that question must be resolved against Helmsman, because of its secondary purpose of needing the inspection to develop information to support a possible contract claim against A & S. To that extent, a "full audit" books and records inspection would not be in A & S's best interests. *CM & M Group, Inc. v. Carroll,* 453 A.2d at 792; *see Skoglund v. Ormand Industries, Inc.,* 372 A.2d at 207.[5]

Since audited statements have not been shown to be essential to a valuation, a critical link in plaintiff's case is missing, which makes it difficult to relate the documents being requested to the purpose for which inspection is being sought. The burden of going forward with evidence of what documents are "essential and sufficient" for the plaintiff's purpose rests upon the shareholder demanding the inspection. That burden has not been met here. This is not to say that the plaintiff is foreclosed from an inspection. What it does mean is that the scope of the inspection cannot be premised upon the need to perform an audit, but must be narrowed to those documents which the evidence has shown to be

essential and sufficient for the purpose for which the inspection is sought.

What documents has the evidence shown to be essential and sufficient to value the A & S stock? Helmsman has already been allowed to inspect A & S's books and records on prior occasions. The most recent, a six day inspection conducted in January, 1986, covered a broad range of documents. That prior inspection, while not conducted for valuation purposes, presumably revealed some pertinent information. A & S has also furnished Helmsman copies of its financial statements for 1984, 1985 and 1986, and has stated its willingness to produce copies of its tax returns for those years, as well as copies of its contracts with the customer's name deleted. Those documents (as well as documents that will be inspected in connection with Helmsman's other purpose of informing itself of all corporate transactions approved at the last three annual stockholder meetings), should provide sufficient information to enable Helmsman to value its minority interest in A & S.

Accordingly, for purposes of valuing its stock in A & S (including a determination of A & S's ability to pay dividends), Helmsman will be permitted to inspect A & S's tax returns for fiscal years 1984 through 1986, all financial statements, audited or unaudited, not already provided, from 1984 to the present; and all contracts with the customers' names deleted.

Finally, with respect to Helmsman's remaining purpose, the record supports Helmsman's entitlement to inspect all documents pertaining to those transactions that the minutes of the 1984, 1985 and 1986 annual stockholder meetings show were approved at those meetings. Those transactions include "all purchase contracts, contributions, compensations, acts, decisions, proceedings, elections, and appointments

---

**5.** Helmsman also justifies its request for broad inspection relief on the basis of *CM & M Group, Inc. v. Carroll, supra.* In *CM & M,* a broad inspection of numerous categories of corporate books and records was permitted to enable the inspecting shareholder to value his minority stock interest in a closely-held corporation. However, in *CM & M* the plaintiff adduced specific expert testimony to prove that the various documents he sought to inspect were essential to establishing a value. No such evidence was presented in this case.

by the Board of Directors and all matters referred to in the annual report to the stockholders for the fiscal year ending 1984 [1985, 1986]" (Plaintiff's Exhibit B). Since the documents falling into that category would appear to cover most transactions of any significance (and also would include minutes of all directors' meetings, bylaws and similar corporate documents), those documents should go a long way towards informing Helmsman of what has tran- spired in the life of the corporation since Helmsman became a stockholder.

\* \* \*

Counsel shall confer and submit a form of order in conformity with this Opinion.