**U.S. DIE CASTING AND DEVELOPMENT CO.,**
**Plaintiff,**

v.

**SECURITY FIRST CORP., Defendant.**

**C.A. No. 14019.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Aug. 31, 1995.
Decided: Feb. 8, 1996.

---

Thomas Herlihy, III, of Herlihy Harker & Kavanaugh, Wilmington; Bryon S. Krantz and Jonathon M. Yarger, Cleveland, OH, of counsel, for Plaintiff.

Peter J. Walsh, Jr. and Kevin R. Shannon, of Potter Anderson & Corroon, Wilmington; Stuart A. Laven and James S. Hogg, of Ulmer & Berne, Cleveland, OH, of counsel, for Defendant.

## *OPINION*

STEELE, Vice Chancellor.

## CONTENTIONS OF PARTIES

Plaintiff, U.S. Die Casting and Development Company ("U.S. Die") made a written demand on Defendant, Security First Corp. ("Security First") on January 12, 1995 to inspect all of Security First's and its subsidiaries' books and records related to a September 1, 1994 Agreement and Plan of Merger ("the Merger Agreement") between Security First and Mid Am Incorporated ("Mid Am"). U.S. Die made its demand pursuant to 8 *Del.C.* § 220. Security First refused to comply.

U.S. Die now asks this Court to issue an order directing Security First, its subsidiaries, officers, agents, and employees to permit U.S. Die, its agents, attorneys, or their employees to inspect and to make copies or extracts from the documents U.S. Die explicitly enumerates in paragraph eight and nine of its February 7, 1995 Complaint.[1] The Complaint reads:

8. By reason of the foregoing, U.S. Die Casting is entitled to inspect and to make copies of the documents demanded, including:

(a) The agreement by and between Security First and Mid Am reported to have been made on or about September 1, 1994, and any amendments and modifications thereof (hereinafter the "Agreement");

(b) All minutes, notes, records, memoranda, writings, correspondence, telephone messages or the like which in any way directly or indirectly deal with or discuss the Agreement;

(c) Press releases related to the Merger Agreement;

(d) Any and all documents or records discussing the relationship between the employees of Security First after the completion of the merger contemplated by the Agreement;

(e) Minutes of all proceedings of directors or committees of directors from January 1, 1994;

(f) All minutes, notes, records, memoranda, writings, correspondence, telephone calls or the like which in any way directly or indirectly deal with or discuss the payment of $275,000 to Mid Am and/or a penalty to be paid if Security First and/or its assets are sold to another in the future;

(g) Any and all bank or savings and loan regulatory applications and amendments thereto related to the Merger Agreement;

(h) Any and all correspondence with federal and/or state bank or savings and loan regulatory agencies in connection with the Agreement; and

(i) The most recent list of stockholders.

9. U.S. Die and Casting is also entitled to any and all modifications, additions, or deletions to any and all of the information referred to in sub-paragraphs (a) through (i) of paragraph 8 as such modifications, additions, or deletions become available to Security First, its agents or representatives.

## FACTUAL BACKGROUND

U.S. Die is an Ohio corporation. It is the record holder of approximately five percent of Security First common stock. David J. Slyman ("Slyman") is the President, Chief Executive Officer, and sole shareholder of U.S. Die. U.S. Die is a family-run Subchapter S corporation.

Security First is a Delaware corporation. Its principal place of business is in Mayfield Heights, Ohio. It serves as a bank holding company for Security First Federal Savings and Loan. Security First stock trades publicly on NASDAQ. Charles F. Valentine ("Valentine") is the Chairman and Chief Executive Officer of Security First.

On September 1, 1994, Defendant entered into the Merger Agreement with Mid Am. The Merger Agreement specified Defendant would merge with Mid Am contingent on certain events and conditions.[2] Mid Am filed

---

1. Plaintiff amended the Complaint in April, 1995. The amendment was not substantive.

2. Defendant and Mid Am never consummated the merger.

documents with the Securities and Exchange Commission approximating the value of the merger at $79 million. The fair market value of Security First common stock increased significantly after the announcement of the merger.

The Merger Agreement enumerated specific means by which the contracting parties could terminate the agreement. The means in relevant part to this action would include:

**Section 9.01 Termination.** This AGREEMENT may be terminated at any time prior to the EFFECTIVE TIME, whether before or after approval by the shareholders of SECURITY and MID AM.

(a) By mutual consent of the Boards of Directors of SECURITY and MID AM;

(b) By the Board of Directors of either SECURITY or MID AM if:

(i) The MERGER shall not have been consummated on or before April 30, 1995 (unless the failure to consummate the MERGER by such date shall be due to the action or failure to act of the party seeking to terminate this AGREEMENT in breach of such party's obligation under this AGREEMENT); or

(ii) Any event occurs which, in the reasonable opinion of either Board, would preclude satisfaction of any of the conditions set forth in Section 7.01 of this AGREEMENT[.]

The Merger Agreement requires Defendant to pay a termination fee of $2 million, plus third party expenses not to exceed $250,000 contingent on the occurrence of certain events within one year after termination:

**Section 9.05 Termination Fee.** In the event of the failure of the SECURITY shareholders to approve the MERGER and this AGREEMENT, provided at the time of the SECURITY shareholders' meeting to vote upon this MERGER either (a) there is outstanding an announced offer by a third-party to acquire SECURITY, by merger consolidation, exchange offer or asset purchase, or a tender offer for at least fifty-one percent (51%) of the outstanding SECURITY common stock in either case providing a per share purchase valued at the time of its announcement of at least $14.79 to the SECURITY shareholders or (b) the Board of Directors of SECURITY fails to favorably recommend approval of the AGREEMENT, then in any such event, SECURITY shall pay Two Million Dollars ($2,000,000) to MID AM as an agreed upon termination fee plus the third-party expenses incurred by MID AM in connection with the transaction contemplated by this AGREEMENT but not to exceed Two Hundred Fifty Thousand Dollars ($250,000) upon the occurrence of any of the following events within one (1) year after termination of this AGREEMENT:

(i) any person or group of persons (other than MID AM and/or its affiliates) shall acquire more than fifty percent (50%) of the outstanding SECURITY common stock at a per share purchase price equal to or greater than $14.79; or

(ii) upon the entry by SECURITY into a definitive agreement with a person or group of persons (other than MID AM and/or its affiliates) for such person or group of persons to acquire, merge or consolidate with SECURITY or to acquire all or substantially all of SECURITY's assets and wherein the per share purchase price at the time of the initial public announcement thereof equals or exceeds $14.79.

In December, 1994, the merger fell through. The parties disagree over the reason for the termination of the Merger Agreement. Defendant alleges the breakdown resulted because of "the realization that Mid Am's management philosophy and direction were fundamentally different from its own." *Defendant Security First Corporation's Post–Trial Answering Brief* at 5. As a result, Defendant's Board of Directors decided to terminate the merger. Plaintiff, understandably unsure of the actual reason the merger fell through, believes if the merger had taken place, the dividend to Security First common stockholders would have tripled.

On December 28, 1994, Defendant and Mid Am entered into a Termination Agreement unrelated to an event contemplated by Section 9.05 of the Merger Agreement. Under the Termination Agreement, Defendant paid

$275,000 to Mid Am. Defendant agreed to pay an additional $2 million contingent on the listed occurrences in Section 9.05(i) and (ii). However, the Termination Agreement extended the penalty period from one year after termination to June 30, 1996—a six month extension.

Security First's common stock value dropped significantly after disclosure of the termination of the Merger Agreement. It has not rebounded. Defendant has, however, increased the dividend payments to its stockholders since the termination. Plaintiff alleges he did not receive notice of the Termination Agreement until after the parties had consummated it.

In January, 1995, Plaintiff sent Defendant a written demand to inspect the books and records of Defendant related to the Merger Agreement and its termination. Defendant refused. Plaintiff made additional demands for information and received limited, unsatisfactory responses.

### CONCLUSIONS OF LAW

 Section 220 of the Delaware Code provides in relevant part:

(b) Any stockholder, in person or by an attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.

8 *Del.C.* § 220 (1994). The scope and purpose of a Section 220 proceeding is narrow. *Kerkorian v. Western Air Lines Inc.*, Del. Ch., 253 A.2d 221, 225, *aff'd*, Del.Supr., 254 A.2d 240 (1969); *Mite Corp. v. Heli–Coil Corp.*, Del.Ch., 256 A.2d 855, 857–58 (1969); *Willard v. Harrworth Corp.*, Del.Ch., 258 A.2d 914, 915 (1969), *aff'd*, Del.Supr., 267 A.2d 577 (1970). Stockholders of record have the statutory right to inspect the stocklist

and books and records of a corporation for a proper purpose. 8 *Del.C.* § 220; Balotti & Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 7.34, 35 (2d ed. 1995). A plaintiff must make a written demand under oath stating a proper purpose motivating inspection of a stockholder list. *Landgarten v. York Rsch. Corp.*, Del. Ch., C.A. No. 8417, Berger, V.C. (Feb. 3, 1988), 1988 WL 7392, Mem. op. at 8–9. Provided the plaintiff has at least one proper purpose among the many it may allege, any secondary purpose is irrelevant. *BBC Acquisition Corp. v. Durr–Fillauer Medical, Inc.*, Del.Ch., 623 A.2d 85, 88 (1992); *Landgarten*, C.A. No. 8417, Mem. op. at 9. Section 220 limits inspection to those documents reasonably necessary to address the properly avowed purpose. Balotti & Finkelstein, § 7.42. Accordingly, a Section 220 proceeding is summary in nature, reflecting the narrow scope of the issues Section 220 governs. 8 *Del.C.* § 220; *Kerkorian*, 253 A.2d at 225; *Mite Corp.*, 256 A.2d at 857–58; *Willard*, 258 A.2d at 915.

 A plaintiff has the burden of proving there is a proper purpose underlying its demand to inspect a corporation's books and records. *Helmsman Mgmt. Serv., Inc. v. A & S Consultants, Inc.*, Del.Ch., 525 A.2d 160, 164 (1987). A proper purpose must be reasonably related to the plaintiff's interest as a shareholder. *Id.*

 According to the *Amended Complaint*[3] and *Plaintiff's Trial Brief* and *Plaintiff's Post–Trial Reply Brief*, Plaintiff's purpose for requesting an inspection of Defendant's books and records is to investigate the possibility of corporate mismanagement. This is a proper purpose under Delaware law. *Helmsman*, 525 A.2d at 165; *Victory Group Ltd. v. Cindy's, Inc.*, Del.Ch., C.A. No. 7042, Longobardi, V.C. (Feb. 24, 1983), 1983 WL 8938, Mem. op. at 4. However, there must be some evidence of possible mismanagement to justify further investigation of the alleged wrongdoing. *Helmsman*, 525 A.2d at 165–66. "A mere statement of a purpose to investigate possible general mis-

---

**3.** Paragraph five of the *Amended Complaint* states Plaintiff seeks to investigate books and records to "determine if improper transactions and/or mismanagement occurred as a result of Security First's actions and dealings regarding the merger with Mid Am."

management, without more, will not entitle a shareholder to broad § 220 inspection relief." *Id.* While Delaware law recognizes "directors, rather than shareholders, manage the business affairs of the corporation[,]" it does not preclude stockholders from making a reasonable inquiry into the directors' actions. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984). As this Court wrote in *Catalano v. T.W.A. Inc.*,

> While it is clear that a stockholder is permitted to inspect the books and records of a corporation in the bona fide investigation of improper transactions, this purpose does not permit a stockholder to engage in a fishing expedition for he must cite some specific transaction to be entitled to an inspection. (citations omitted).

Del.Ch., C.A. No. 5352, Hartnett, V.C. (Dec. 27, 1977) 1977 WL 9558 at *2.

 Specifically, Plaintiff questions Defendant's payment of $275,000 to Mid Am "when Defendant never broke the Merger Agreement." Plaintiff also refers to Defendant's failure to request documentation of Mid Am's expenses to justify Defendant's expenditure of $275,000—$25,000 more than the Merger Agreement stipulated for expenses. Defendant characterizes this payment as consideration for a mutual release of the Merger Agreement. I accept Plaintiff's written proffer this payment alone represents a specific transaction raising the *plausibility* of more than speculative, general mismanagement. His desire to inspect books and records to investigate mismanagement is reasonably related to Plaintiff's shareholder status.

Contrary to Defendant's allegations, the evidentiary hearing produced testimony substantiating Plaintiff's claim. I listened to the trial testimony, observed the demeanor of the witnesses, and assessed their apparent frankness and the fairness of their testimony. I find Plaintiff's stated proper purpose convincing.

Plaintiff's proper purpose is tied specifically to the point in time of Defendant's failure to consummate the Merger Agreement. On its face, the merger between Defendant and Mid Am appeared beneficial to Plaintiff and other similarly situated stockholders, or presumably, Defendant's management would not have entered into the Merger Agreement in the first place. The market reacted favorably after the announcement of the merger. Defendant then reneged on the Merger Agreement necessitating the payment from the corporate treasury of a negotiated agreed penalty. Defendant couched this payment as consideration for termination but failed to produce a semblance of legal impediment to the merger.

Defendant's Chief Executive Officer, delivered patent sophistry from the witness stand, justifying the Board's abrogation of the Merger Agreement as "the realization that Mid Am's management philosophy and direction were fundamentally different from its own." [4] Curiously, Defendant went on to issue an increased dividend to its stockholders. A thoughtful stockholder might look at this dividend increase as an effort to ameliorate dismay about the Board of Directors' abandonment of a seemingly beneficial merger for Security First stockholders.

A reasonable stockholder could conclude prudent management would have researched "fundamental" similarities and dissimilarities of the merging company before entering the Merger Agreement. In the absence of full and open dissemination of information to shareholders, the reasonably prudent shareholder might infer the action to be Security First's management's thinly veiled attempt at entrenchment. Plaintiff has, in my view, met its burden of proof establishing a proper purpose for its request to inspect books and records. Plaintiff's statement of proper purpose not only tracks § 220, but Defendant has failed to rebut this proper purpose. Furthermore, Plaintiff's request to inspect books and records is self-tailored to relate reasonably to its stated proper purpose. Plaintiff's request to inspect books and records is not overly broad. Accordingly, I grant Plaintiff's demand to inspect all of Security First's and

---

**4.** This quotation comes from *Defendant Security First Corporation's Post–Trial Answering Brief* at 5. I find it to be a fair characterization of Valentine's trial testimony. *See* **Trial Transcript** at 71–72, 76–77.

its subsidiaries' books and records related to the Merger Agreement enumerated above.

### Plaintiff's Request to Inspect Defendant's List of Stockholders

Unlike a request to inspect books and records, the defendant has the burden to demonstrate the plaintiff seeks the stocklist for an improper purpose. *Landgarten,* C.A. No. 8417, Mem. op. at 8–9; *Skoglund and Ackerley v. Ormand Indus., Inc.,* Del.Ch., C.A. No. 5144, Brown, V.C. (Dec. 3, 1976), 1976 WL 2443 at *1.

Defendant has not met this burden. The gravamen of Defendant's argument is Slyman's admitted testimony he had "no idea" what he would do with the list; Slyman was merely curious as to who Defendant's stockholders are. Defendant assumes too much. Defendant advances this conclusion without submitting any evidence other than Slyman's own words on cross-examination, which it takes out of context. In fact, Slyman wants U.S. Die to have the stockholder list in order to communicate with the stockholders of Security First regarding the failed merger and to determine the directors' ownership percentage of the company. A desire to communicate with other stockholders in regard to a specific event of presumed concern to them all is a proper purpose for inspecting Defendant's list of stockholders.

I grant Plaintiff's request to inspect the list of Security First's stockholders. A separate order will follow reflecting this opinion.