# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AVERY L. WOODS, TRUSTEE OF THE AVERY L. WOODS TRUST, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0153-JTL |
| SAHARA ENTERPRISES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 21, 2020
Date Decided: July 22, 2020

Paul J. Lockwood, Bonnie W. David, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Charles F. Smith, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, Illinois; *Attorneys for Plaintiff*.

Ashley R. Altschuler, Harrison S. Carpenter, MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; *Attorneys for Defendant*.

**LASTER, V.C.**

Defendant Sahara Enterprises, Inc. (the "Company") operates as a privately held investment fund. Plaintiff Avery L. Woods is the trustee of the Avery L. Woods Trust (the "Trust"), which owns 278 shares of the Company's common stock.

In recent years, the Company's investments have consistently underperformed broad market indices. Woods became concerned that the Company was paying its officers and directors, paying highly compensated fund managers, and paying professional consultants to help select the fund managers, yet achieving subpar results.

Woods wanted to understand the value of her shares. She also wanted to investigate whether the Company's underperformance was due to mismanagement or a lack of oversight.

Woods served a demand for books and records under Section 220 of the Delaware General Corporation Law. The Company provided Woods with a list of its stockholders and a copy of its bylaws. The Company otherwise refused her request, contending that she lacked a proper purpose. Alternatively, the Company argued that the scope of her demand was overly broad. After further negotiations, the Company provided Woods with a summary of the director's fees received by the individuals who served on the boards of directors of the Company and its sister entity, SMCO, Inc. The Company refused to provide any other information.

Woods brought this action to enforce her statutory inspection rights. Woods proved that she has proper purposes to conduct an inspection, and she established her right to inspect certain categories of documents.

## I. FACTUAL BACKGROUND

The case was tried on a paper record comprising 122 exhibits. The following facts were proven by a preponderance of the evidence.[1]

### A. The Company

The Company is a privately held Delaware corporation with its headquarters in Chicago, Illinois. It operates as a closed-end investment fund for the descendants of Frank H. Woods. *See* JX 24. The Company has fifty-six stockholders, all of whom are members of the Woods family. JX 4 at '146–50.

The Company does not directly own any investments. It is a holding company that owns a 99% member interest in Sahara Investments, LLC, which in turn holds various securities. JX 23 at '578. SMCO is the managing member of Sahara Investments and the holder of its remaining member interest. *Id.*

The current three-entity structure is traceable to a reorganization completed in 2001. Before the reorganization, SMCO and Sahara Investments did not exist. The Company owned its investments directly or through wholly owned subsidiaries. *See* JX 23.

The reorganization was designed to achieve tax benefits by separating the ownership of the Company's investments from the management, administrative, and investment functions. JX 23; JX 24 at '586. To achieve that goal, the Company formed SMCO and

---

[1] Citations in the form "Tr." refer to the trial transcript. Citations in the form "JX — at —" refer to trial exhibits; page citations refer to the last three digits of the control or JX number.

Sahara Investments as wholly owned subsidiaries. JX 23 at '578; JX 24 at '586. The Company transferred its employees and management functions to SMCO and its assets to Sahara Investments. JX 24 at '586. The Company then distributed all of its shares in SMCO to the stockholders of the Company, making SMCO a "sister company," rather than a subsidiary. *Id.*

There is no ready market for the Company's shares. Transfer is also restricted by provisions in stockholder agreements to which Woods and other stockholders are parties. *See* Tr. 97.

As a small, privately held corporation, the Company is not obligated to make disclosures under the federal securities laws. Each year, the Company nevertheless provides its stockholders with an annual report that includes audited financial statements. *See, e.g.*, JX 16; JX 22; JX 25. The Company also hosts an annual meeting of stockholders and provides the stockholders with presentations on the Company's performance. *See, e.g.*, JX 14; JX 15; JX 17; JX 18.

The presentations and annual reports provide information about the Company and SMCO on a consolidated basis. The materials treat the two entities as a single company.

**B.      Woods Becomes Concerned About Her Investment.**

The Trust is a revocable trust settled under the laws of the State of Florida. JX 1 at '002, '027. The Trust is the record owner of 278 shares of Company common stock. JX 4 at '149. Woods is the trustee of the Trust.

Over the past several years, Woods became concerned about the Trust's investment in the Company. The Company has six portfolios, categorized as "Domestic Equity,"

3

"Developed International Equity," "Emerging Markets Equity," "Marketable Alternative Assets," "Non-Marketable Alternative Assets," and "Cash and Fixed Income." JX 15 at '227. The limited information provided by the Company suggests that its portfolios have underperformed broad market indices. For instance, the Company's 2018 annual report noted that the Company's "total return in 2018 was . . . -20 basis points (bp) behind the S&P 500 Index," its "domestic equity return of -9.36% was -498 bp behind the S&P 500 Index," its "program of hedge funds produced a negative return that fell short of long-term expectations," and its "debt was a drag on overall performance in 2018 as loan interest cost exceeded the overall portfolio return." JX 16 at '275–76. The presentation that Company management gave during the same year indicated that the Company had underperformed the S&P 500 over a one-year, three-year, five-year, and ten-year period. JX 18 at '368.

In 2018, the Company paid seven outside investment managers to manage its "Domestic Equity" portfolio. JX 16 at '276. The Company paid multiple outside investment managers to manage its other portfolios as well. *Id.* at '276–78.

The Company pays compensation to directors, officers, and employees to manage the managers who manage its investment portfolios. *See* JX 23 at '579. The Company represented in this action that SMCO employs between thirty and fifty people. *See* JX 23; Tr. 96. The Company also hires consultants to help identify and select portfolio managers. *See* Tr. 110. Woods views these arrangement as forcing the Company to pay fees on top of fees on top of compensation. *See* Tr. 109. Woods believes that Sahara stockholders could achieve better results at a lower cost by investing in index funds. *See* JX 18 at '368; Tr. 15.

4

The Company has not provided information about its investment strategies, director and officer compensation, or related-party transactions. *See, e.g.*, JX 16; JX 18. Stockholders have been left in the dark, without any information about the potential reasons for the Company's poor performance.

## C. The Section 220 Demand

On August 8, 2019, acting on behalf of the Trust, Woods sent the Company a demand for books and records. *See* JX 2 (the "Demand"). The Demand identified three purposes for the inspection:

> (1) to obtain names and addresses of Company stockholders to enable [the Trust] to communicate with its fellow Company stockholders on matters relating to their mutual interests as stockholders,
>
> (2) to ascertain the value of its interests in the Company, which is privately held and about which public information is therefore unavailable, and
>
> (3) to monitor the directors and officers of the Company to ensure that they act in compliance with their fiduciary duties and have not engaged in any undisclosed self-dealing.

*Id.* at '199–'200 (formatting added). The Demand asked for twelve categories of information. *Id.* at '198–99. The specific requests appear and are addressed in the Legal Analysis. *See infra* Part II.B.

The Company agreed to provide Woods with the "names and addresses of the Company's current record stockholders" and "a copy of the current Bylaws of the Company." JX 4 at '143. The Company otherwise rejected the Demand.

In October 2019, Woods asked the Company to reconsider its rejection of the Demand and produce additional books and records. In December, "as a gesture of good will," the Company provided Woods with "a confidential summary of its directors'

5

compensation for the last five annual terms." JX 6 at '177. The Company otherwise reiterated its rejection of the Demand.

**D.    This Litigation**

On March 2, 2020, Woods filed this action. The Company answered and raised seven affirmative defenses. Dkt. 7. The first affirmative defense stated, "Plaintiff's Complaint should be dismissed as moot because Sahara is a non-operating holding company that lacks many of the 'books and records' sought by Plaintiff." *Id.* at 19. It is not clear how lacking many documents would render the action "moot." Regardless, that was the Company's position.

On April 3, 2020, the parties had a call to discuss the answer, including the first affirmative defense. JX 7; *see also* Dkt. 10 at 3−4. The Company represented that it could not access many of the books and records sought in the Demand because they were held by SMCO. The Company took the position that it had no right, contractual or otherwise, to obtain books and records held by SMCO. *See* Dkt. 10 at 3.

By letter dated April 21, 2020, the Company raised its "mootness" defense with the Court, asking to defer trial and arguing that Woods should serve a separate demand on SMCO. Dkt. 10. The Company represented as follows:

> As plaintiff has known (for years), SMCO -- *not [the Company]* -- makes the investment management decisions for [Investments]. SMCO also hires all personnel responsible for operating the investment business. [The Company] is a holding company, including its ~99% ownership interest in [Sahara Investments]. . . . Thus, Ms. Woods's demand to investigate alleged mismanagement in connection with the "investment business" and to value her shares should have been directed to SMCO, not [the Company].

6

*Id.* at 2–3 (emphasis in original). The Company represented that "SMCO is a separate legal entity not controlled by [the Company], with its own board, corporate formalities and governance documents. Accordingly, [the Company] is not able to produce SMCO's documents in a Section 220 action, as that decision belongs only to SMCO." *Id.* at 5.

A trial on a paper record took place on May 21, 2020. At trial, the Company stood by its position that it might not have any responsive documents. Tr. 96–97, 123.

## II.     LEGAL ANALYSIS

Section 220(b) of the Delaware General Corporation Law grants "[a]ny stockholder" the right "to inspect for any proper purpose . . . [t]he corporation's stock ledger, a list of its stockholders, and its other books and records . . . ." 8 *Del. C.* § 220(b). "Section 220 is now recognized as 'an important part of the corporate governance landscape.'" *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 571 (Del. 1997)).

To obtain books and records under Section 220(b), the plaintiff must establish by a preponderance of the evidence (i) its status as a stockholder, (ii) compliance with the statutory requirements for making a demand, and (iii) a proper purpose for conducting the inspection. *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012). After meeting these requirements, the plaintiff must demonstrate by a preponderance of the evidence that "each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection." *Thomas & Betts Corp. v. Leviton*

7

*Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996). The disputed issues in this case are whether the Trust has a proper purpose and the scope of the inspection.

## A. The Trust's Purposes

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). In the language of the statute, "[a] proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220(b).

"There is no shortage of proper purposes under Delaware law . . . ." *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007). Prior cases have recognized that a stockholder can state a proper purpose by seeking

- to investigate allegedly improper transactions or mismanagement;

- to clarify an unexplained discrepancy in the corporation's financial statements regarding assets;

- to investigate the possibility of an improper transfer of assets out of the corporation;

- to ascertain the value of his stock;

- to aid litigation he has instituted and to contact other stockholders regarding litigation and invite their association with him in the case;

- "[t]o inform fellow shareholders of one's view concerning the wisdom or fairness, from the point of view of the shareholders, of a proposed recapitalization and to encourage fellow shareholders to seek appraisal";

- "to discuss corporate finances and management's inadequacies, and then, depending on the responses, determine stockholder sentiment for either a change in management or a sale pursuant to a tender offer";

- to inquire into the independence, good faith, and due care of a special committee formed to consider a demand to institute derivative litigation;

8

- to communicate with other stockholders regarding a tender offer;

- to communicate with other stockholders in order to effectuate changes in management policies;

- to investigate the stockholder's possible entitlement to oversubscription privileges in connection with a rights offering;

- to determine an individual's suitability to serve as a director;

- to obtain names and addresses of stockholders for a contemplated proxy solicitation; or

- to obtain particularized facts needed to adequately allege demand futility after the corporation has admitted engaging in backdating stock options.

*City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 289 n.30 (Del. 2010) (emphasis omitted, formatting altered to add bullets, and internal footnotes omitted) (quoting Edward P. Welch et al., *Folk on the Delaware General Corporation Law, Fundamentals* § 220.6.3, at GCL-VII-202 to -206 (2009 ed.)).

### 1. Valuing The Trust's Shares

The most straightforward purpose in the Demand is "to ascertain the value of [the Trust's] interests in the Company." JX 2 at '199. Woods has established that she holds this purpose and is entitled to an inspection.

"Valuation of a stockholder's investment in a corporation, particularly where the corporation is privately held, has long been recognized as a proper purpose under 8 *Del. C.* § 220."[2]

---

[2] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995), *aff'd*, 681 A.2d 1026 (Del. 1996); *see also CM & M Gp.*, 453 A.2d at 792 ("[T]he valuation of one's shares is a proper purpose for the inspection of corporate books and records.");

> Because they do not receive the mandated, periodic disclosures associated with a publicly held corporation, minority shareholders in a privately held corporation face certain unique risks. Such shareholders may, therefore, have a legitimate need to inspect the corporation's books and records to value their investment, in order to decide whether to buy additional shares, sell their shares, or take some other action to protect their investment.

*Thomas & Betts*, 685 A.2d at 713. The Court of Chancery "has recognized on several occasions that because of the absence of a publicly traded market, a shareholder in a closely held corporation has no ability to value his or her shares, yet would need to make an initial valuation, if only to determine whether the shares are marketable, and if so, at what price."[3]

Here, the Trust is a stockholder of the Company, which is privately held. Woods seeks books and records, in part, so that she "can ascertain the value of [the Trust's] interests in the Company." Dkt. 13 at 3. That is a valid purpose.

---

*Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *8 (Del. Ch. May 14, 2014) ("It is settled law that the valuation of one's shares is a valid purpose to inspect books and records."); *Madison Ave. Inv. P'rs, LLC v. Am. First Real Estate Inv. P'rs, L.P.*, 806 A.2d 165, 174 (Del. Ch. 2002) ("It is settled law in Delaware that valuation of one's shares is a proper purpose for the inspection of corporate books and records." (internal quotation marks omitted)).

[3] *Id.* at 713 n.10 (collecting authorities); *see also Bosse v. WorldWebDex Corp.*, 2009 WL 2425718, at *1 (Del. Ch. July 30, 2009) (noting that a stockholder's purpose of "determining the value of his stock" is "a clearly proper purpose when, as here, a company's stock is not publicly listed or otherwise traded in a market where valuation determinations can be readily made"); *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 560804, at *4 (Del. Ch. Sept. 29, 1994) ("When a minority shareholder in a closely held corporation whose stock is not publicly traded needs to value his or her shares in order to decide whether to sell them, normally the only way to accomplish that is by examining the appropriate corporate books and records.").

10

In response, the Company argues that Woods failed to prove "that she *actually* has an intent to use the requested books and records" to value her shares. Dkt. 14 at 25 (emphasis in original). The Company maintains that a "mere incantation of an accepted 'valuation' purpose in a private corporation is [not] sufficient." Dkt. 23 at 14. According to the Company, a stockholder must demonstrate "*why* she needs to value shares." Dkt. 14 at 3 (emphasis added). The Company argues that Woods had to point to some reason for valuing her shares, such as evidence that she has a desire "to sell her shares, buy out another family member, personal estate planning, apply for credit, make an offer to purchase the Company, or none of the above." *Id.* at 25.

The Company's position is contrary to Delaware law. It would require that a stockholder establish both a proper purpose (valuing shares) and an end use for the resulting valuation. Delaware law does not require that a stockholder establish both a purpose for seeking an inspection and an end to which the fruits of the inspection will be put. *Cf. Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *11–14 (Del. Ch. Jan. 13, 2020). It is sufficient under Delaware law that a stockholder has a proper purpose reasonable related to its interests as a stockholder, such as valuing its shares. *See* 8 *Del. C.* § 220(b).

Delaware precedent explicitly rejects the Company's position. A plaintiff's purpose "to value her shares" in the company "is clearly related to her interest as a stockholder of [the company], and is therefore legally proper under 8 *Del. C.* § 220(b)." *Macklowe*, 1994 WL 560804, at *4 (citing *CM & M Gp.*, 453 A.2d at 792–93; *Radwick Pty., Ltd. v. Med., Inc.*, 1984 WL 8264 (Del. Ch. Nov. 7, 1984)). "There is no requirement that [a stockholder]

must, in addition [to stating a valuation purpose], have taken concrete steps to sell her shares in order to rely upon that purpose as a basis for seeking inspection under § 220." *Id.*

Instead, once a stockholder has identified a proper purpose, such as valuing shares, the burden shifts to the corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper. *See Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007). "This showing is not made where a secondary improper purpose exists. Instead, in order to succeed, the defendant must prove that the plaintiff pursued its claim under false pretenses, and its primary purpose is indeed improper. Such a showing is fact intensive and difficult to establish." *Id.*

The Company relies on two cases to support its contention that a stockholder must identify an end use for the valuation. Both involved efforts by a corporation to prove that a stockholder had an improper purpose.

The first is *Radwick*, where the stockholder was an Australian-based investment firm that had acquired a significant stake in a privately held medical company. *See* 1984 WL 8264, at *1. The investor "became concerned about the dilution of its holdings as a result of private placements." *Id.* The investor also became concerned that the company was undertaking a major expansion in Australia without consulting with the investor or taking advantage of its expertise. *Id.* The investor sought books and records to value its shares. *Id.* at *2. The company contended that the investor's purpose was pretextual and that the investor was merely trying to harass the company. *Id.* at *3. In support of this

argument, the company pointed out that the investor admitted that it had not yet decided whether to buy or sell its shares and might decide to do nothing. *Id.*

The court held that the investor's valuation purpose was bona fide, explaining, "It is settled law in Delaware that valuation of one's shares is a proper purpose for the inspection of corporate books and records. Furthermore, once a proper purpose is established, any secondary purpose or ulterior motive is irrelevant." *Id.* at *2 (citations omitted). The court concluded that, "as stated in its demand letter, [the plaintiff sought] the enumerated books and records in order to value its stock." *Id.* at *3. The court observed that the investor's open-mindedness toward what to do with its shares was "only a reflection of the business realities of any possible transaction where the party is not forced to accept the deal regardless of its terms." *Id.*

The *Radwick* decision does not suggest that a stockholder must have a sincerely held valuation purpose and also show some external reason for needing a valuation. The *Radwick* decision instead demonstrates that a stockholder only needs a sincerely held valuation purpose.

The second case is *Helmsman Management Services., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160 (Del. Ch. 1987). There, the stockholder had invested in a privately held corporation as part of a business deal that also included a license agreement, which the court labeled the "1983 Agreement." *Id.* at 161. When the stockholder sought books and records to value its shares, the corporation maintained that the stockholder did not have a proper purpose, claiming that the stockholder "seeks to gather evidence to support a potential claim to recover monies under the 1983 Agreement." *Id.* at 164. There was some

13

evidence to support this possibility, and the court expressed concern that the stockholder's valuation purpose "is, at the present time, somewhat academic." *Id.* at 165. In that context, the court observed that it was "not sufficient for [the stockholder] merely to assert that it would like to value [its] stock. Without a showing of a present need for such a valuation, a mere statement of that purpose, though valid in law, might not be *bona fide* in fact." *Id.*

After reviewing the evidence, the *Helmsman* court concluded that the stockholder's valuation purpose was bona fide, even though the stockholder had "made no decision to dispose of [its] stock, [had] taken no steps to market that stock, and [had] no potential buyer for it." *Id.* In accepting the stockholder's valuation purpose, the court relied on the circumstances that typically confront a stockholder in a small, privately held company:

> There is a very limited market for [the] stock; indeed, given the corporation's right of first refusal, the only potential buyer may be [the corporation itself]. For that reason, [the stockholder] must necessarily resort to [the corporation's] books and records to establish a value as a predicate for deciding whether its stockholdings are marketable and, if so, on what terms. Those considerations, plus [the stockholder's] interest in extricating itself from a minority stockholder position in a corporation with which it is no longer in a friendly relationship, persuade me that [the stockholder's] valuation purpose is valid in fact as well as in law.

*Id.* Like *Radwick*, *Helmsman* did not hold that stockholder must demonstrate a need to value her shares to satisfy her burden under Section 220. The *Helmsman* decision instead reflects the settled proposition of law that a valuation purpose must be bona fide.

As *Radwick* and *Helmsman* show, Section 220 does not require a stockholder to say why it seeks to value its shares. But this does not make the stockholder's intentions irrelevant. If a defendant argues that a stockholder has an improper purpose and has evidence to support its assertion, then a stockholder can point to how it plans to use the

14

valuation as evidence that its claimed purpose is its actual purpose. If a stockholder cannot identify a credible potential end use, then the court may infer that the stockholder's stated purpose is not its actual purpose. *See Marathon P'rs, L.P. v. M & F Worldwide Corp.*, 2004 WL 1728604, at *8 (Del. Ch. July 30, 2004). Or, as in *Radwick*, *Helmsman*, and other cases, the court may credit the stockholder's valuation purpose. *See Kortüm v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 123 (Del. Ch. 2000) (holding that the fact that the plaintiff "has not yet decided whether (or not) to purchase or sell, [does] not—alone and without more—defeat the factual *bona fides* of its valuation purpose").

In the Demand, Woods averred that she wanted "to ascertain the value of [the Trust's] interests in the Company." JX 2 at '199. She did not describe what she might do with the valuation, but that is not required. She later indicated that she may sell her shares. Dkt. 13 at 28, 34. The circumstances she faces as a minority stockholder in a private company that is underperforming render her verified assertion that she wishes to value her shares more than sufficient.

The Company failed to prove that valuing the Trust's shares was not Woods' actual purpose and that she in fact has some ulterior and improper purpose. The Company offered no evidence on this point. The Company chose not to depose Woods, and it did not point to any documents or circumstances that suggest an improper motive. *See* Tr. 22, 61–62. The Company only offered suspicions based on its professed inability to understand why Woods might want books and records. *See* Tr. 57, 63, 91. Wondering why a stockholder might want to value her shares, particularly when the stockholder has offered credible reasons, is not enough to carry the Company's burden.

15

Woods established that she has a proper purpose in seeking to value her shares. She is entitled to inspect books and records in support of that purpose.

### 2. Investigating Wrongdoing Or Mismanagement

The Demand also cites a desire "to monitor the directors and officers of the Company to ensure that they act in compliance with their fiduciary duties and have not engaged in any undisclosed self-dealing." JX 2 at '199. In framing Woods' purpose in this fashion, the Demand departed from the more customary verbiage of "investigating wrongdoing or mismanagement." Based on Woods' briefing and arguments at trial, this decision construes her framing as synonymous with the customary version.

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'" *Seinfeld*, 909 A.2d at 121.

> One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management. When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate.

*KT4 P'rs v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019).

To obtain books and records to investigate corporate wrongdoing, a stockholder must "show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation . . . ." *Seinfeld*, 909 A.2d at 123. The stockholder need only establish by a preponderance of the evidence that there is a credible basis from which the court can infer

16

a possibility of wrongdoing. "A stockholder is not required to prove by a preponderance of the evidence that [wrongdoing] and mismanagement are actually occurring."[4]

The "credible basis" standard is "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123. A plaintiff may meet it by making "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *Id.*; *accord Sec. First*, 687 A.2d at 568. The plaintiff may rely on circumstantial evidence. *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014). The plaintiff also may rely on hearsay, as long as it is sufficiently reliable.[5] A stockholder, however, cannot obtain books and records simply because the stockholder disagrees with a board decision, even if the decision turned out poorly in hindsight. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. ex rel. Citigroup, Inc. v. Corbat*, 2017 WL 6452240, at *18 (Del. Ch. Dec. 18, 2017) (collecting authorities).

Woods contends that that there is a credible basis to suspect wrongdoing because the Company's "investments have consistently underperformed key market indexes, while

---

[4] *Seinfeld*, 909 A.2d at 123 (internal quotation marks omitted); *accord Axcelis*, 1 A.3d at 286–87 ("Such evidence need not prove that wrongdoing, in fact, occurred."); *Sec. First*, 687 A.2d at 565 ("The stockholder need not actually prove the wrongdoing itself by a preponderance of the evidence."); *id.* at 567 ("The actual wrongdoing itself need not be proved in a Section 220 proceeding, however."); *Thomas & Betts*, 681 A.2d at 1031 ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring.").

[5] *See Thomas & Betts*, 681 A.2d at 1032–33; *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208–13 (Del. Ch. 1976).

17

the Company has steadfastly refused to provide information about the compensation that the Company has paid to its officers, employees and other advisors charged with managing those assets, let alone the Board's process in approving that compensation." Dkt. 13 at 29. Standing alone, it is unlikely that this justification would have been sufficient to establish a credible basis to suspect wrongdoing sufficient to conduct an inspection. The Company's poor performance, without more, has not been sufficiently protracted or extreme to draw an inference of wrongdoing.

During this litigation, however, the Company took a position that bolstered Woods' investigative purpose. In its answer to the complaint, the Company asserted as an affirmative defense that Woods' complaint "should be dismissed as moot because Sahara is a non-operating holding company that lacks many of the 'books and records' sought by Plaintiff." Dkt. 7 at 19. When Woods sought to understand this affirmative defense, the Company maintained that its books and records were held by SMCO, not the Company. The Company further claimed that the Company had no right, contractual or otherwise, to access books and records held by SMCO. *See* Dkt. 10 at 3.

Woods pressed forward with the litigation, hoping to obtain whatever responsive books and records that the Company had. The Company then raised its "mootness" defense with this court, arguing that "SMCO -- *not [the Company]* -- makes the investment management decisions for [Sahara Investments]" and that "SMCO also hires all personnel responsible for operating the investment business." Dkt. 10 at 2–3 (emphasis in original). The Company represented that it had no control over SMCO and no ability to obtain

documents. *See id.* at 5. At trial, the Company reiterated that it might not have any documents. Tr. 96–97, 123.

By taking this position, the Company sought to gain a short-term tactical advantage in the Section 220 action. But pursuing this strategy gave rise to two bases to suspect possible wrongdoing.

First, the Company's position facially conflicted with the representations that it made to its stockholders in connection with the reorganization that resulted in the creation of SMCO. When soliciting stockholder approval, the Company represented that the reorganization would not have any effect on the ability of stockholders to obtain information from the Company. *See* Part II.B.3, *infra.* The contrast between the Company's current position and its representations to stockholders provides a credible basis to suspect that the Company's directors and officers have engaged in wrongdoing by failing to manage the Company in the manner that they committed that they would.

Second, by representing that the Company did not have any responsive books and records, the Company created a credible basis to suspect that the Company's directors have abdicated their statutory responsibilities. If the Company's board of directors relied on SMCO, then the Company should have, at a minimum, books and records documenting the board's good faith reliance on and active oversight of SMCO. Presumably there would be books and records showing how the Board ensured that SMCO managed the Company's assets responsibly, such as standards or policies that the board established for SMCO to follow and a record of the board monitoring SMCO's performance. Yet according to Company counsel, the Company may not have any documents responsive to the Demand.

19

Directors of a Delaware corporation owe two fiduciary duties—care and loyalty.[6] The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Stone*, 911 A.2d at 370 (internal quotation marks omitted). The duty of loyalty and its subsidiary element of good faith require that directors pursue the best interests of the corporation and its stockholders. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52–53 (Del. 2006); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996). Directors must take active steps to oversee the operations of the corporation and become informed about the risks confronting the company. In the words of the seminal oversight case, directors must "attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists." *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996); *accord Stone*, 911 A.2d at 364−65, 368–69.

It is, of course, permissible for a board of directors to delegate management responsibilities to officers, employees, and outside advisors. What the board invariably retains—and must fulfill—is the obligation of oversight. It would be an exceptional board of directors that could satisfy its duty of oversight without creating any books and records—no minutes, no resolutions, no actions by written consent, no reports, no policies,

---

[6] *See, e.g.*, *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

no nothing. Yet that is what the Company claimed by arguing that this action was "moot" because the Company did not have any responsive books and records.

The Company's own arguments thus established a credible basis to suspect corporate wrongdoing. Woods has therefore established a proper purpose for an inspection.

### 3. Communicating With Stockholders

Woods' remaining purpose is "to communicate with its fellow Company stockholders on matters relating to their mutual interests as stockholders . . . ." JX 2 at '199. As framed in the Demand, this purpose only applied to Woods' request for the "names and addresses of Company stockholders." *Id.* The Company produced a stock list in August 2019, rendering this issue moot. *See* Tr. 21.

In her briefing, Woods sought to expand her communication purpose and rely on it to obtain other books and records. She described her communication purpose as "directly related to her valuation and investigation purposes." Dkt. 13 at 27; *see* Tr. 33. She did not say specifically what she wanted to tell other stockholders, explaining that whether she wanted to communicate and what she would say would depend on "what is revealed through her inspection." *See* Dkt. 22 at 13.

Under these circumstances, the proper analytical framework for analyzing the Demand is through Woods' valuation and investigation purposes. Woods seeks to value the Trust's shares and explore corporate wrongdoing, and if she learns anything significant, then she may want to communicate with stockholders about it. It is perhaps possible that there could be a case in which a communication purpose could support an independent inspection, but this decision need not consider that issue.

21

**B.     The Scope Of The Inspection**

Because the plaintiffs have met the test for an inspection, this court must determine its scope. *Sec. First*, 687 A.2d at 569. The production of records in response to a Section 220 demand is not the equivalent of discovery in a plenary action. *Id.* The Section 220 plaintiff must establish "that each category of the books and records requested is essential and sufficient to [its] stated purpose." *Thomas & Betts*, 681 A.2d at 1035. "[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'" *Palantir*, 203 A.3d at 752 (internal quotation marks omitted). At bottom, the plaintiff should receive "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose." *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114–15 (Del. 2002).

When tailoring the production order, the court must balance the interests of the stockholder and the corporation. *See Sec. First*, 687 A.2d at 569. When "a plaintiff has shown evidence of wide-ranging mismanagement or waste, a more wide-ranging inspection may be justified." *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *5 (Del. Ch. Jan. 9, 2003); *accord Skoglund*, 372 A.2d at 211. "[W]here a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders." *Saito*, 806 A.2d at 114–15. "The source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's

22

inspection rights. The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose." *Id.* at 118.

The starting point (and often the ending point) for an adequate inspection will be board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered (the "Formal Board Materials").[7] A corporation should be able to collect and provide its Formal Board Materials promptly and with minimal burden. In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form that contains the minutes and other Formal Board Materials for that meeting.[8]

---

[7] *See Cook v. Hewlett-Packard*, 2014 WL 311111, at *4 (Del. Ch. Jan. 30, 2014) (limiting inspection to "board-level" documents relating to an acquisition and subsequent problems with the acquired company); *Robotti & Co. v. Gulfport Energy Corp.*, 2007 WL 2019796, at *4 (Del. Ch. July 3, 2007) (permitting inspection of board minutes); *Grimes v. DSC Comms. Corp.*, 724 A.2d 561, 567 (Del. Ch. 1998) ("[T]he right to obtain corporate records [to investigate demand refusal] focuses on the committee process itself and extends at least to reports or minutes, reflecting the corporate action," including "copies of the Special Committee's report, minutes of the meetings of the Special Committee and minutes of any meeting of the board of directors relating to the creation or functioning of the Special Committee, including any meeting of the board of directors at which the recommendation of the Special Committee was considered or approved" (footnote and internal quotation marks omitted)); *see also Axcelis*, 1 A.3d at 291 (observing that if a board declines to accept a director resignation under a system of majority voting with a board-rejectable resignation, then a stockholder can obtain through a Section 220 inspection "any documents and other records upon which the board relied").

[8] *See, e.g.*, 3 William B. Solomon & Michael A. Nemeroff, *Practice Checklist, Successful Partnering Between Inside & Outside Counsel* § 46A:31 (2015) ("In connection with the corporate secretary's role as the company's record keeper, the corporate secretary often maintains the official minutes of the meetings of the board in a central location. . . . The corporate secretary generally prepares board packages or gathers them from the applicable members of management, reviews what is gathered to ensure it is narrowly

23

If the plaintiff makes a proper showing, an inspection may extend to informal materials that evidence the directors' deliberations, the information that they received, and the decisions they reached ("Informal Board Materials"). Informal Board Materials generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings. Informal Board Materials also may include emails and other types of communication sent among the directors themselves, even if the directors used non-corporate accounts. *See Palantir*, 203 A.3d at 742, 753; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 793 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). In an appropriate case, an inspection may extend further to encompass communications and materials that were only shared among or reviewed by officers and employees ("Officer-Level Materials"). *See Wal-Mart*, 95 A.3d at 1273 (affirming order requiring production of Officer-Level Materials); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004) (explaining that Officer-Level Materials can be necessary to understand how "directors

---

tailored to the board's purposes and disseminates the materials necessary for the board members to review in advance of each meeting of the board."); Soc'y of Corp. Sec'ys. & Gov'ce Prof'ls, Corporation Minutes: A Publication for the Corporate Secretary 23–24 (Feb. 2014) ("Corporate secretaries may also maintain separate meeting files for each board and committee meeting which includes the material related to the meeting and materials referenced in the minutes. . . . Companies have also started storing these materials electronically. . . .").

handled [management] proposals or conduct in various contexts," which could reveal patterns of boardroom behavior).

### 1. The Categories Of Books And Records

Whether a stockholder is entitled to a particular category of documents "is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises." *Wal-Mart*, 95 A.3d at 1271 (internal quotation marks omitted). The Demand sought twelve categories of books and records from the Company. The first two requests sought:

> (a) A copy of the current stock ledger and a current list of all Company record and beneficial stockholders, as well as any information regarding the mailing addresses, telephone numbers and email addresses of any of the record or beneficial stockholders; [and]

> (b) A correct and complete copy of the bylaws of the Company, including any amendments thereto.

These requests were rendered moot when the Company produced its stock list and bylaws. *See* Tr. 21.

The remaining ten requests can be grouped into four broad categories:

- requests seeking financial information about the Company (requests (f), (g), and (j));

- requests seeking information about the Company's investment strategies (requests (c), (d), (e), and (h));

- requests seeking information about compensation paid by the Company to its directors, officers, and employees, as well as any interested-party transactions

25

between the Company and any directors, officers, employees, or stockholders of the Company (request (i) and (*l*)); and

- requests seeking information about compensation and fees paid by the Company to its advisors (request (k)).

The specific requests are reproduced below.

### a. Financial Information

Requests (f), (g), and (j) seek financial information about the Company, including its financial reports, business plans, valuations, budgets, financial guidance, forecasts, and projections. Request (f) seeks "[a]ll financial reports or summaries of the Company that were provided to the Board or any committee thereof from January 1, 2015 to present." JX 2 at '199. It thus seeks Formal Board Materials that speak to the Demand's valuation purpose. This request falls squarely within the heart of Section 220 and is granted.

Request (g) seeks "[m]onthly, quarterly or other periodic financial reports or summaries of the Company generated by management from January 1, 2015 to present." *Id.* It thus seeks Officer-Level Materials. Woods did not distinguish between requests (f) and (g), simply asserting that both "on their face are necessary and essential to Plaintiff's purpose of valuing the Trust's shares." Dkt. 13 at 31. Woods has not shown a need to go beyond Formal Board Materials. If she receives Formal Board Materials and determines that they are inadequate for her purpose, then she may renew her request for Officer-Level Materials.

Request (j) seeks "[d]ocuments, correspondence, reports or drafts thereof concerning any investment decision, business plan, valuation, budget, financial guidance, forecast or projections concerning the Company from January 1, 2015 to present." JX 2 at

'199. The request does not distinguish among Formal Board Materials, Informal Board Materials, or Officer-Level Materials. The detailed nature of the request suggests that it seeks all three.

As framed, request (j) is overly broad. In the abstract, "[t]he importance of forecasts and projections to valuation of a company is so basic that it does not require citation." *Quantum Tech.*, 2014 WL 2156622, at \*12 (Del. Ch. May 14, 2014). Woods is therefore entitled to inspect Formal Board Materials falling into this category. Woods has not proven that Informal Board Materials or Officer-Level Materials concerning financial guidance, forecasts, or projections are necessary and essential to her valuation purpose, and thus she is not entitled to those materials. If she receives Formal Board Materials and determines that they are inadequate for her purpose, then she may renew her request for Informal Board Materials and Officer-Level Materials.

### b. Investment Strategies

According to Woods, requests (c), (d), (e), and (h) seek information about the Company's investment strategies. Requests (c), (d), and (e) are actually much broader. They seek

> (c) All minutes of meetings of the Company's Board of Directors (the "Board") or any committee thereof, including any attachments thereto, from January 1, 2015 to present;

> (d) All presentations, agendas, reports or other materials provided to the Board or any committee thereof in preparation for, or review at, any meetings from January 1, 2015 to present; [and]

> (e) All notes taken at any meetings of the Board or any committee thereof from January 1, 2015 to present.

27

JX 2 at '198–99. These requests thus seek all of the Company's Formal Board Materials from January 1, 2015, to the present, plus Informal Board Materials in the form of notes.

Request (h) seeks a subset of the foregoing materials. It asks for

[a]ll materials created for or provided to the Board or any committee thereof from January 1, 2015 to present concerning the Company's investment strategies, any actual or proposed changes to the mix or types of investments made by the Company; returns from any investments; liquidity considerations; or tax consequences of investments for the Company or its stockholders.

*Id.* at '199. Request (h) thus seeks Formal Board Materials relating to the Company's investment strategies, investment holdings, and related issues.

The blanket request to inspect all of a Company's Formal Board Materials, plus notes of all meetings, is not sufficiently targeted. Request (h) specifically requests Formal Board Materials concerning the Company's investment strategy and investments, which is a core area of focus for the Demand. Books and records responsive to this request appear sufficient for Woods' purpose. The Company shall produce materials responsive to Request (h). As to matters falling within the scope of Request (h), the Company shall produce the types of materials called for by Requests (c), (d), and (e). The Company need not produce materials that otherwise would be called for by Requests (c), (d), and (e), but which do not relate to the topics covered in Request (h).

### c. Insider Compensation And Interested-Party Transactions

Requests (i) and (*l*) seek information about the compensation and other benefits received by the humans who control the Company. Request (i) focuses on compensation. Request (*l*) focuses on interested-party transactions.

Request (i) asks for

> [a]ll materials created for or provided to the Board or any committee thereof from January 1, 2015 to present concerning compensation or remuneration for directors, officers, managers or employees of the Company, including documents sufficient to identify the total amount of compensation actually paid or to be paid to any such director or officer in 2015, 2016, 2017, 2018 and 2019, and any employment or consulting agreement executed in connection therewith.

JX 2 at '199. The request thus seeks only Formal Board Materials. The Company already has produced information about its director compensation, so the request only pertains to Formal Board Materials relating to officer, manager, and employee compensation.

A request that seeks information about the compensation of every employee in the Company is likely to be excessive. Because the request is limited to Formal Board Materials, it is likely only to cover senior officers and employees whose compensation is significant enough to warrant board consideration or approval.

Request (*l*) seeks

> [d]ocuments, correspondence, reports or drafts thereof concerning any "interested-party transactions," including any transactions, contracts, agreements or arrangements between the Company, on the one hand, and any director, officer, employee or stockholder of the Company or any of their immediate family members, associates or affiliated entities, on the other hand.

*Id.* Request (*l*) is not limited to Formal Board Materials. By its terms, it also seeks Informal Board Materials, Officer-Level Materials, or some combination of the three.

Woods is entitled to information on both topics, which are necessary and essential to Woods' valuation purpose. A valuation professional can use this information to make normalizing adjustments to the extent necessary when valuing the firm. *See, e.g., Zutrau v.*

29

*Jansing*, 2014 WL 3772859, at *39 (Del. Ch. July 31, 2014); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 470-73 (Del. Ch. 2011); *In re Radiology Assocs., Inc.*, 611 A.2d 485, 490-91 (Del. Ch. 1991).

More fundamentally, how directors and senior officers are compensated and whether they are the beneficiaries of any related-party transactions are basic facts that stockholders are entitled to know. Section 220(b) defines a proper purpose as any purpose reasonably related to the stockholder's interest as a stockholder. Some information is so foundational that a desire to have that information is itself a proper purpose.

A stockholder should be entitled to obtain a general description of the company's business, the identities of its directors and senior officers, and basic information about how they are compensated. *See KT4 P'rs LLC v. Palantir Techs., Inc.*, 2018 WL 1023155, at *18 (Del. Ch. Feb. 22, 2018) (noting that stockholders "deserve basic information about their investments" including "the identities of directors and officers and their dates of service" and "books and records relating to [the company's] annual stockholder meetings"), *rev'd in part, aff'd in relevant part*, 203 A.3d 738 (Del. 2019). Directors and officers are fiduciaries who have a duty to act loyally, in good faith, with due care to maximize the long-term value of the corporation for the benefit of its residual claimants. The residual claimants are entitled to know how their fiduciaries are taking money out of the corporation. A stockholder should not have to point to a valuation purpose or assert suspicions about corporate wrongdoing to be able to learn how much money the directors and senior officers are receiving.

For a public company, the federal securities laws mandate that this information be disclosed. *See* Regulation S-K, 17 C.F.R. § 229.401 (2020) (requiring disclosure of information regarding directors, executive officers, and certain "significant employees"). For a public company, that level of information is likely sufficient. *See Seinfeld*, 909 A.2d at 120 (denying inspection for information going beyond publicly disclosed compensation figures where stockholder did not have a credible basis to suspect possible wrongdoing). When a company is privately held and does not provide disclosures on those subjects, a Section 220 demand is the proper means of seeking the information.

This decision is not suggesting that a stockholder should be entitled to receive compensation information for every officer in the company. Particularly in a large company, courts will need to draw a reasonable line. Analogies to other sources of authority may prove helpful, such as the federal securities laws, Section 3114(b) of Title 10, or the 2020 amendments to Section 145(e).

In this case, it is not necessary to draw fine lines. The Company is a small, privately held corporation. It has a limited number of directors. It has a limited number of senior officers. Before the Trust began its efforts to obtain books and records, the limited information that the Company provided did not make clear who the Company's directors and officers were. The annual report that the Company provided each year presented a joint picture of the Company and SMCO. The report identified directors and officers without designating who served which entity. *See, e.g.*, JX 16 at '286; JX 22 at '494; JX 25 at '437. In response to Woods' requests, the Company provided information about its directors, but declined to provide information about its officers. JX 6 at '179–80.

31

The Trust is entitled to know (i) who the Company's senior officers are, (ii) how much compensation they receive, and (iii) whether the Company has entered into related-party transactions with any officers or directors. The Trust's desire to know this information is itself a proper purpose.

The Company argued in its briefing that Woods did not need any information about interested transactions because of the information that the Company provided in its annual reports from 2016 and 2017. According to the Company,

> Under GAAP, self-dealing transactions, if material, are audited and disclosed in the financial statements. Here, had the companies' independent auditor, KPMG, uncovered material self-dealing transactions during its annual audits, the auditors would have either disclosed the discrepancies in their report or refused to certify the financial statements. No self-dealing transactions were ever reported by KPMG. Ms. Woods certainly does not allege that KPMG's audit reports are inaccurate, incomplete or compromised.

Dkt. 14 at 11 n.7. A corporation cannot strip its stockholders of their information rights by pointing to its accountant, nor does the definition of materiality under GAAP establish the standard for self-dealing under Delaware law. Woods is entitled to know whether the Company's fiduciaries have entered into related-party transactions with the Company and to obtain books and records related to those transactions.

Woods only seeks Formal Board Materials relating to compensation. She seeks more extensive information about related-party transactions, including Informal Board Materials and Officer-Level Materials. In the first instance, Woods may inspect Formal Board Materials about related-party transactions. If she determines that the Formal Board Materials are inadequate for her purpose, then she may renew her request for Informal Board Materials and Officer-Level Materials.

32

### d. Advisor Compensation

Request (k) seeks information about compensation paid by the Company to its advisors. It asks for

> [d]ocuments, correspondence, reports or drafts thereof concerning any payments made to any advisors (including legal, financial or investment advisors), consultants or agents engaged by the Company from January 1, 2015 to present, including documents sufficient to identify the total amount of payments made to any such advisor, consultant or agent in 2015, 2016, 2017, 2018 and 2019, and any engagement letters executed in connection therewith.

JX 3 at '199. It thus seeks Formal Board Materials, Informal Board Materials, and Officer-Level Materials, although it indicates that Woods will be satisfied with information "sufficient to identify the total amount of payments made to such advisor . . . ."

In its full flower, this request is overly broad. The decision to engage consultants or advisors is ordinarily entrusted to the business judgment of the Board. *See generally Brehm v. Eisner*, 746 A.2d 244, 261 (Del. 2000). A request for all documents concerning any payment made to any advisor is more akin to discovery in plenary litigation than a Section 220 request.

Woods' "sufficient to show" formulation, however, is adequately tailored. Information sufficient to show the total amount of payments made annually to each advisor, consultant, or agent will enable Woods or her valuation professional to make normalizing adjustments, if warranted, to the Company's expenses when valuing the firm. The level of fees may also support a concern about corporate wrongdoing if it appears that the Company is paying twice, once for internal management and once for external management.

## 2. The Covered Period

For nine of the ten requests, Woods sought documents from January 1, 2015, to the present. For the request about interested transactions, Woods did not specify a time period.

Valuations are often based on historical trends, and a five-year period is common. *See, e.g.*, *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *5–6 (Del. Ch. Oct. 19, 2001) (ordering production of documents related to valuation purpose for five-year period); *Carroll v. CM&M Gp., Inc.*, 1981 WL 7626, at *5 (Del. Ch. Sept. 24, 1981) (ordering inspection of, among other things, complete audited and financial statements for a five-year period), *aff'd*, 453 A.2d 788 (Del. 1982). For the requests supported by a valuation purpose, this time period makes sense. For other requests, five years is a reasonable amount of time. Given the nature of the requests and the Company's business, the burden on the Company is likely to be low.

## 3. The Entities That Will Be Directed To Provide Books And Records

The final question is whether production is limited to the Company or whether it will extend to other entities. "The rights of shareholders secured by § 220 cannot be defeated simply by having another entity hold the records relating to [the corporation] which [it] ordinarily would have." *Dobler*, 2001 WL 1334182, at *10.

As a result of the reorganization from 2001, the Company owns a 99% member interest in Sahara Investments. The Company's "sister company," SMCO, owns the other 1% and manages Sahara Investments. JX 23; JX 24 at '586; Tr. 96–97.

When the Company engaged in the reorganization, it solicited approval from its stockholders. JX 23. The memorandum distributed to stockholders contained the following representations:

- The reorganization "will not cause any change in the information available to stockholders." *Id.* at '580.

- "Although the [reorganization] adds certain complexities to [the Company's] legal structure, it will have no impact on individual stockholders other than the economic benefits and tax savings" discussed in the memorandum. *Id.* at '581.

Despite telling its stockholders that the reorganization would "not cause any change in the information available to stockholders," the Company is now telling Woods that the reorganization had precisely that effect. Throughout this litigation, the Company has maintained that because SMCO has the documents that Woods wants to obtain, the Company cannot produce them. *See* Dkt. 7 at 19. And despite telling stockholders that the reorganization would "have no impact on individual stockholders other than economic benefits and tax savings," the Company is now maintaining that the reorganization cut off the stockholders' ability to obtain books and records about the Company's oversight of its investments.

The Company is required to provide Woods with "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose." *Saito*, 806 A.2d at 114–15. The record establishes that the humans who control the Company have control over the books and records necessary to respond to Woods' request. The same individuals sit on the board of directors for both the Company and SMCO. JX 19 at '461; JX 20 at '462; JX 21 at '477. The companies share

35

office space, and the companies' officers and employees use the same "@saharaent.com" domain name for their email addresses. JX 16 at '286. The Company provides its stockholders with consolidated financial information on behalf of both companies. Its financial reports state, "Although technically two separate companies, Sahara Enterprises, Inc. and SMCO, Inc. are audited and reported annually on a combined basis." JX 9 at '002. The Company also has responded to requests for information from stockholders with information about both companies in a single communication.[9] Recognizing this reality, the Company represented at trial that it would not "hide documents" based on "the labels on the filing cabinets." Tr. 123.

Directing the Company to produce documents that the humans who control it can access whenever they wish in the ordinary course of business does not involve any type of veil piercing, nor does it ignore the separate existence of these entities. It rather recognizes that the books and records nominally held by SMCO or Sahara Investments are within the Company's "possession, custody or control." A corporation is a juridical entity that only can act through human representatives. *See, e.g.*, *Carden v. Arkoma Assocs.*, 494 U.S. 185, 201 (1990); *State v. Colbert*, 1987 WL 26917, at *2 (Del. Nov. 23, 1987); *Clifton v. State*,

---

[9] *E.g.*, JX 10 ("I have gathered some information regarding Avery's basis in her shares of Sahara Enterprises, Inc. and SMCO, Inc. The information is within two documents: 'Avery Stock Basis Info.xlsx' and 'SMCO Basis letter.pdf'."); JX 11 (providing certificates of incorporation, bylaws, and stockholder records for the Company and SMCO); JX 12 (providing records for the Company and SMCO); JX 13 (providing an "estimate of the unaudited and undiscounted net asset value per share of [the Company] and SMCO, Inc.").

36

145 A.2d 392, 393 (Del. 1958). If the entity's human representatives can access books and records in the ordinary course of business whenever they wish to do so for their own purposes, then they equally can be compelled to do so by court order. When responding to the Demand, the Company shall also produce any documents nominally held by SMCO or Sahara Investments that the human controllers of the Company (its directors and senior officers) can access in the ordinary course of business.

### III.    CONCLUSION

Woods is granted an inspection of books and records as set forth in this decision. The parties shall agree upon and submit a final order that has been approved as to form. If there are other issues that the court needs to address to bring this matter to a conclusion at the trial level, then the parties shall submit a joint letter within ten days that identifies those issues and recommends a path for resolving them.