IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HAUPPAUGE DIGITAL, INC., | § | |
| | § | No. 442, 2022 |
| | § | |
| Defendant-Below, | § | |
| Appellant, | § | Court Below—Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2019-0848 |
| JAMES RIVEST, | § | |
| | § | |
| Plaintiff-Below, | § | |
| Appellee. | § | |

Argued: May 3, 2023
Decided: July 10, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 10th day of July, 2023, after consideration of the argument of counsel, the parties' briefs and the record on appeal, it appears to the Court that:

(1) This appeal concerns the extent to which a Delaware corporation's production of books and records under Section 220 of the Delaware General Corporation Law should be subject to confidentiality restrictions.

(2) The corporation—a "long dark" publicly traded company known as Hauppauge Digital, Inc. ("Hauppauge" or the "Company")—develops, manufactures, and sells consumer electronics. Hauppauge experienced financial difficulties in 2010, eventually disclosing a going-concern risk in its Form 10-K for

fiscal year ending September 30, 2013 (the "2013 Form 10-K"). Its audited financial statements for the same period also contained a going-concern qualification. The Company "went dark" after involuntarily delisting from the Nasdaq stock exchange in 2013 for failing to meet listing requirements and subsequently terminated its registration as an issuer in July 2014 and stopped reporting its financials publicly. Hauppauge's common stock—its only class of equity—has nonetheless continued trading in the public over-the-counter (the "OTC") market. Despite Hauppauge's lack of current public financial reporting, in 2018, James Rivest, an individual investor, bought shares on the OTC market as a "deep value" investment.[1]

(3)    In July 2019, Rivest sent Hauppauge a Section 220 demand to inspect its books and records for the purpose of valuing his shares. Receiving no response, Rivest retained counsel and sent Hauppauge a second demand in October 2019, seeking books and records, including financial statements for the years 2016 through 2018 and any appraisals or valuations relating to the value of the Company, its stock, or any of its assets. Like the July 2019 demand, this demand stated that Rivest was seeking documents so that he could value his shares. After Hauppauge failed to respond to the second demand, Rivest brought a Section 220 action in the Court of Chancery; a Master presided over the matter. To simplify the issues for

---

[1] *Rivest v. Hauppauge Digital, Inc.*, 2022 WL 3973101, at *8 (Del. Ch. Sep. 1, 2022).

2

decision, Rivest limited his request to historical financial statements for closed periods, withdrawing his request for appraisals or other valuation-related documents.

(4)   In December 2019, Rivest moved for a default judgment, and the Master set a deadline requiring Hauppauge to respond by April 20, 2020.  Four days after the deadline expired, the Master granted Rivest's motion for a default judgment.  Hours later, the Master received a letter from Hauppauge's sole director and chief executive officer, Kenneth Plotkin.[2]  In the letter, Plotkin expressed his belief that Hauppauge, "a public corporation,"[3] was not required to disclose its financial statements because it was deregistered.  He claimed that, because Hauppauge shares continued to trade on the public OTC market, Rivest did not need books and records to value his shares.  Around this time, Rivest made a supplemental demand for 2019 and 2020 financial statements. The following month, on May 5, the Master received an additional letter from Plotkin, in which he agreed to produce the documents subject to "a reasonable Non Disclosure Agreement."[4]  Raising the issue for the first time, Plotkin stated that "the public

---

[2] Plotkin, purporting to represent the Company *pro se*, sent the letter, dated April 20, via regular mail, but it was not postmarked until April 21, after the deadline had expired.  *Id.* at *7.
[3] *Id.* at *8.
[4] *Id.*

release of the financial condition of the Company will cause a loss of confidence among our customers and result in the loss of business[.]"[5]

(5) Ultimately, the default judgment entered against Hauppauge was vacated.[6] Thereafter, Hauppauge moved for summary judgment, claiming that Rivest could not establish a proper purpose as a matter of law. Among other things, it complained for the first time that public disclosure would implicate a newly amended Rule of the Securities Exchange Commission, Rule 15c2-11 (the "Quotation Rule").[7] Effective September 28, 2021, the Quotation Rule imposes requirements before any broker-dealer or qualified interdealer quotation system (jointly, "Market Makers") can provide a quotation for a security in the OTC market. Relevant here, the "information review requirement" prohibits a Market Maker from publishing a quotation unless the Market Maker has obtained and reviewed certain current and publicly available information about the issuer. Market Makers may, however, continue to provide unsolicited quotations in the OTC "Expert Market," but, to protect retail investors, only certain sophisticated investors can view those quotations.[8]

---

[5] *Id.*

[6] *Id.* at *9.

[7] *Id.* at *10–11.

[8] *See id.* at *11 (citing Cass Sanford, *Understanding the Expert Market*, OTC MARKETS BLOG (Mar. 25, 2021), https://blog.otcmarkets.com/2021/03/25/understanding-the-expert-market; Publication or Submission of Quotations Without Specified Information, 85 Fed. Reg. 68124, 68145 & 68186 n.646 (Oct. 27, 2020)).

(6) In September 2021, Hauppauge's motion for summary judgment was denied without prejudice. The following month, in October 2021, the Master held a one-day trial via Zoom. The trial was recorded to facilitate *de novo* review by the Vice Chancellor if exceptions were taken.

(7) At trial, Plotkin and Hauppauge's chief financial officer, Gerald Tucciarone, testified that any public disclosure of Hauppauge's financial statements would harm its business, citing two incidents from 2014. They testified that two manufacturers reduced Hauppauge's credit lines after the release of the Company's 2013 Form 10-K disclosing its financial statements.[9] They also testified about a 2014 meeting between Plotkin and a buyer from Best Buy that led Plotkin to suspect that disclosure of the 2013 Form 10-K caused Best Buy to cut ties with Hauppauge.[10] After the trial, the Master issued a report (the "Report"), recommending that Rivest had a proper purpose in seeking to inspect Hauppauge's books and records to value his holdings and that the production be subject to a two-year confidentiality agreement. Notably, only Rivest took exception to the Report, challenging the recommendation that confidential treatment was warranted.

---

[9] *Id.* at *21.

[10] Tucciarone further testified that Hauppauge operates in a "pretty competitive environment" and that if he got his hands on a competitor's financial information that showed it was "doing very poorly," he would use it against the competitor. *Id.* at *22.

(8)    Thereafter, the Vice Chancellor, in a memorandum opinion and final judgment, declined to adopt the Report in its entirety.  Hauppauge did not take exception with the Master's recommendation that the court find that Rivest had a proper purpose; consequently, the Court of Chancery adopted that recommendation as a ruling of the court.  The court did not, however, adopt the recommendation that the production be made subject to a two-year confidentiality agreement.  Rather, the Vice Chancellor, reviewing the facts and law *de novo*, held that, under this Court's decision in *Tiger v. Boast Apparel, Inc.*,[11] the Section 220 production was not subject to a presumption of confidentiality and that "the Company failed to provide a credible basis for a threat of harm sufficient to warrant a confidentiality restriction."[12]  Thus, the court ordered Hauppauge to produce annual and quarterly financial statements for closed periods (2016-2022) free of any confidentiality restrictions.  Relatedly, the court noted that "Delaware law should strive to maintain its historically symbiotic relationship with the federal securities laws"[13]—a nod to the SEC's Quotation Rule.

(9)    On appeal, Hauppauge argues that the Court of Chancery erroneously applied *Tiger*'s balancing test by imposing a heightened burden on the Company. Hauppauge claims that the Vice Chancellor decided, without guidance from this

---

[11] 214 A.3d 933 (Del. 2019).
[12] *Rivest*, 2022 WL 3973101, at *23.
[13] *Id.* at *26.

Court, that the evidentiary standard within *Tiger*'s balancing test is a "credible basis."[14] Hauppauge further asserts that the appropriate *Tiger* evidentiary standard should be "a credible basis, by a preponderance of the evidence, with the burden placed upon [the plaintiff-stockholder][.]"[15] Alternatively, citing *Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*,[16] a pre-*Tiger* case, Hauppauge—an unregistered public company—argues that it should be treated like a private company for the purpose of analyzing whether a Section 220 production should be made subject to confidentiality restrictions. We disagree with these contentions. As will be explained below, the Vice Chancellor's application of *Tiger*'s balancing test was proper.

(10) This Court reviews the Court of Chancery's determination of any limitation or condition on a Section 220 production under an abuse-of-discretion standard that "is highly deferential."[17] "Undergirding this discretion is a recognition

---

[14] It is the case that the Court of Chancery used the phrase "credible basis"—a term of art in our Section 220 jurisprudence that typically refers to the evidentiary standard that a stockholder must satisfy to establish a proper purpose for an investigatory inspection demand—and that "credible basis" does not appear in *Tiger*. *See Seinfeld v. Verizon Communications, Inc.*, 909 A.2d 117, 123 (Del. 2006) ("Stockholders need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation—a showing that 'may ultimately fall short of demonstrating that anything wrong occurred.' That 'threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'").

[15] Opening Br. at 18.

[16] 2015 WL 915486 (Del. Ch. Feb. 26, 2015).

[17] *KT4 Partners LLC v. Palantir Technologies, Inc.*, 203 A.3d 738, 748 (Del. 2019) (quoting *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1272 (Del. 2014)).

that the interests of the corporation must be harmonized with those of the inspecting stockholder."[18] "Given 'the breadth of this discretion, Delaware courts have viewed the determination of whether to impose a condition or limitation on an inspection as inherently case-by-case and fact specific.'"[19] "When an act of judicial discretion is under review the reviewing court may not substitute its own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[20]

(11) At the outset, we note that Hauppauge conflates the burden of proof placed upon a stockholder to establish a proper purpose in a Section 220 action with the Court of Chancery's authority under Section 220 to impose limitations and conditions on a Section 220 production. Once a stockholder has established a proper purpose to inspect a corporation's books and records, whether the Court of Chancery then imposes limitations or conditions on the Section 220 production is not predetermined by either the stockholder's or the corporation's failure to carry an evidentiary burden. This is because Section 220 vests the Court of Chancery with discretion to "prescribe any limitations or conditions with reference to" a books-and-records inspection.[21] It may, of course, in the exercise of that discretion, refrain

---

[18] *Id.* (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1035 (Del. 1996)).
[19] *Id.* (quoting *United Techs. Corp. v. Treppel*, 109 A.3d 553, 558 (Del. 2014)) (internal quotations omitted).
[20] *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968).
[21] 8 *Del. C.* § 220 (c)(3).

from imposing such limitations or conditions. In either case, the court's analysis is not constrained by a burden of proof as that concept is typically understood. Instead, it engages in a context-driven balancing exercise, the result of which will not be disturbed on appeal unless clearly unreasonable or capricious.[22]

(12) In *Tiger*, this Court provided guidance regarding the Court of Chancery's broad discretion under Section 220, holding that a Section 220 production is not subject to a presumption of confidentiality.[23] We explained that, in determining whether to impose or lift confidentiality restrictions, the Court of Chancery "should weigh the stockholder's legitimate interests in free communication against the corporation's legitimate interests in confidentiality."[24] "Although a corporation need not show specific harm that would result from disclosure before receiving confidentiality treatment in a Section 220 case, one cannot conclude reflexively that the need for confidentiality is readily apparent."[25] The Court of Chancery, exercising its discretion, "must assess and compare benefits and harms when determining the initial degree and duration of confidentiality."[26] Importantly, the standards for placing confidentiality restrictions are not the same as

---

[22] *Chavin*, 243 A.2d at 699.
[23] *Tiger*, 214 A.3d at 939.
[24] *Id.* at 934. *See CM & M Group, Inc. v. Carroll*, 453 A.2d 788, 793 (Del. 1982) ("Counterposed to the duty to protect the rights of the stockholder, the Court has the duty to safeguard the rights and legitimate interests of the corporation.").
[25] *Tiger*, 214 A.3d at 939 (cleaned up) (internal quotations and citations omitted).
[26] *Id.*

those for lifting existing restrictions.[27] "If anything, the burden upon the corporation is more demanding—and the corresponding burden upon the stockholder less demanding—when the parties request a court to craft an initial confidentiality order than when a stockholder later requests a court to modify a presumably reasonable existing confidentiality order."[28] "[W]e expect that the targets of Section 220 demands will often be able to demonstrate that some degree of confidentiality is warranted where they are asked to produce nonpublic information."[29] As noted above, the Court of Chancery exercises its discretion under Section 220 when applying the *Tiger* balancing test; neither the corporation nor the stockholder has an evidentiary burden under *Tiger*.

(13)   Here, the Court of Chancery, weighing the parties' legitimate interests under *Tiger*, concluded that Hauppauge's interest in placing confidentiality restrictions on financial statements for closed periods did not outweigh Rivest's legitimate interests in free communication.  It reasoned that the harm Hauppauge experienced in 2014—the reduction of trade credit and the loss of the Best Buy business—was not caused by Hauppauge disclosing financial statements in its 2013 Form 10-K "but rather because of the information those statements provided about

---

[27] *Id.* ("[S]imply because a party has not shown circumstances justifying modification of a judgment does not indicate that judgment would be entered against it in the first instance.").
[28] *Id.*
[29] *Id.*

10

its financial condition."[30] It determined, in other words, that the threat of harm did not come from the disclosure of the financial statements itself but the fact that Hauppauge's weak financial condition became public knowledge.[31] The court found that, "[a]gainst that meager showing, Rivest has identified important interests[,]" including his wish to confer with other stockholders about the value of the Company and his stock.[32] It further explained that, if it accepted Plotkin's and Tucciarone's trial testimony as a basis for a confidentiality restriction, the court—finding said testimony unpersuasive—"would be endorsing a presumption in disguise" in violation of *Tiger*.[33]

(14) Likewise, as to Hauppauge's claim that it should be treated like a private company under *Southpaw*, the Court of Chancery observed that "[t]o err on the side of confidentiality, notwithstanding serious doubts about whether the information is confidential, is to apply a presumption of confidentiality."[34] In

---

[30] *Rivest*, 2022 WL 3973101, at *21.

[31] *Id.* at *22 ("The Company's officers seem to believe that their counterparties would not want to be in business with them if they knew the Company's true financial condition. They are effectively seeking a confidentiality restriction so that they can continue to create a misleading impression about the Company's financial strength. That is not an equity that favors a confidentiality restriction."); *Id.* (noting that "[p]ortions of the Company's 2015 to 2018 federal tax returns were made public in 2020 in connection with unrelated litigation in New York. Tucciarone conceded that, despite this disclosure, there is no evidence that any competitor used information in those tax returns against the Company.").

[32] *Id.* at *24.

[33] *Id.* at *23 (noting that the testimony that Plotkin and Tucciarone gave about the threat of harm "was exaggerated and relied on a formulaic assertion about the reality of conducting business in a free-market economy.").

[34] *Id.* at *19.

reaching its conclusion, the court noted "the fact that the Company accepted money from public investors and then took those investors dark with it undercuts the Company's claim of confidentiality."[35]  The court held that Hauppauge failed to make a persuasive showing of harm sufficient to outweigh Rivest's interest or support imposing a two-year confidentiality restriction on financial statements for closed periods.  This, in our view, represents a faithful application of *Tiger*'s balancing test.  And the Court of Chancery did not abuse its discretion in ordering the Section 220 production free from confidentiality restrictions, as its determination rested upon a reasonable basis, not clearly unreasonable or capricious grounds.[36]

(15)  Hauppauge also contends on appeal that the Vice Chancellor committed legal error by considering how a confidentiality condition would affect Rivest's ability to communicate freely with other stockholders and buy or sell shares of the Company, particularly in light of the SEC's Quotation Rule.  Hauppauge relies on *Southpaw*, which noted that "the Court of Chancery does not craft use and confidentiality restrictions on Section 220 productions based on the rights and

---

[35] *Id. See id.* at *18 ("[R]etail investors continue to hold ninety percent of [Hauppauge's] shares. The Company is not an entity that has consistently preserved its status as a private entity.  Nor did the Company build confidentiality restrictions into its constitutive documents.").
[36] *Cf. KT4 Partners LLC*, 203 A.3d at 764 (holding that the Court of Chancery's denial of a request to modify a limitation on a Section 220 production was an abuse of discretion, because this Court could not discern a reasonable basis for the denial).

restrictions found in securities laws."[37] The Vice Chancellor, however, distinguished *Southpaw* on this very point, noting that the stockholder in that case sought to use Section 220 as a vehicle for enforcing the securities laws. The court found that, here, by contrast, Rivest sought to enforce a right to obtain financial statements under Section 220, then use the financial statements in a way that he is permitted to do under the securities laws (the Quotation Rule).[38] In the same vein, Hauppauge contends that Rivest's rights could not have been impinged by a confidentiality condition, because he is an accredited investor—having a net worth greater than $1,000,000—and can view unsolicited quotations of Hauppauge's stock in the OTC Expert Market. This issue was not fairly presented to the Master or the Vice Chancellor, and it is therefore waived. As noted above, neither party took exceptions to the Master's recommendation that Rivest had a proper purpose, and that recommendation was adopted as a ruling of the Court of Chancery.

(16) Lastly, relying on *DiGiacobbe v. Sestak*,[39] Hauppauge asserts that the court erred because it reversed material credibility determinations made by the Master without holding a new trial. But Hauppauge misconstrues *DiGiacobbe*, as

---

[37] *Rivest*, 2022 WL 3973101, at \*26 ("The *Southpaw* report did not say that this court never considers the federal securities laws when dealing with Section 220 actions. . . . The Master cautioned that Section 220 should not be converted into a method of enforcing the requirements of the federal securities laws.").

[38] *See Carroll*, 453 A.2d at 792 ("[O]nce a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant.").

[39] 743 A.2d 180 (Del. 1999).

a principle of law, requiring a new trial before the court may make an independent witness credibility assessment in its *de novo* review. In *DiGiacobbe*, this Court held that a Master is constitutionally prohibited from exercising judicial power, and therefore a "master's rulings, findings of fact, conclusions of law, and recommended disposition have no effect until they are adopted by a judge after a 'meaningful review.'"[40] Notably, *DiGiacobbe* was decided before the Court of Chancery adopted rules setting forth the standard of review by which a Master's findings should be reviewed.[41] There, the Court of Chancery also reviewed the Master's recommendation without a record. *DiGiacobbe* held that, when a litigant takes exception with a Master's report, the Court of Chancery reviews the Master's findings—both factual and legal—*de novo*. We explained that *de novo* review "generally means a new trial or hearing on questions of fact" but that it is also "possible" for the court to conduct a review *de novo* on the record.[42] In this case, the trial, which took place via Zoom, was recorded. Given the completeness of the record available to the Court of Chancery, the determination whether any further hearings were necessary to complete its *de novo* review of the Master's findings

---

[40] *Id.* at 183 (quoting *Redden v. McGill*, 549 A.2d 695, 698 (Del. 1988)).
[41] *See* Court of Chancery Rule 144.
[42] *DiGiacobbe*, 743 A.2d at 184.

was a sound exercise of the Court of Chancery's discretion.[43]  The Vice Chancellor

did not err in reviewing the record *de novo* without a new trial.

NOW, THEREFORE, IT IS ORDERED that the opinion and order of the

Court of Chancery be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[43] *See McCloskey v. McCloskey*, 2014 WL 4364469, at *9 (Del. Ch. Sept. 3, 2014) (videotaping the trial before the Master facilitated the Chancellor's review of the record *de novo* without a new trial where the Chancellor determined that no good cause existed to conduct a hearing to take additional testimony), *aff'd*, 113 A.3d 1081, 2015 WL 1973853 (Del. Apr. 29, 2015) (TABLE).